

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

271 Cadman Plaza East
Brooklyn, New York 11201

JMS:DEL

August 2, 2021

By ECF

The Honorable Eric R. Komitee
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Victor J. Orena
     Criminal Docket No. 92-351 (EK)

Dear Judge Komitee:

  The government respectfully submits this letter in opposition to defendant Victor Orena's motion for early release filed pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  See ECF No. 1864 ("Def. Mot.") (redacted).  As set forth below, the Court should deny the defendant's motion, because the considerations set forth in 18 U.S.C. § 3553(a) favor denial.

 I. Background

  A. Offense Conduct

  As was established at trial, the defendant has been associated with the Colombo organized crime family of La Cosa Nostra (the "Colombo crime family") since the early 1970s and was inducted as a member in 1977.  Presentence Investigation Report dated April 1, 1993 ("PSR") ¶ 41.  By 1988, Carmine Persico, then incarcerated but still the official boss of the Colombo crime family, appointed Orena the family's acting boss.  Id. ¶ 42.  However, Persico and Orena agreed that Orena would step down as acting boss when Persico's son Alphonse "Little Allie Boy" Persico was released from federal custody, so Alphonse Persico could assume control of the crime family.  Id. ¶ 43.  Discord marked the defendant's leadership of the Colombo crime family.  Several members of the crime family testified in various trials that Orena retained an "excessively large share" of the crime family's criminally deprived proceeds at the expense of other members.  Id. ¶ 44.

  Then, in the early 1990s, when Alphonse Persico sought to take control of the Colombo crime family, then-57-year-old Orena refused to cede leadership, igniting an

internecine war within the Colombo crime family.  Id.  On one side were those loyal to the defendant who supported his elevation to official boss; on the other were those loyal to Carmine Persico and Alphonse Persico, led by consigliere Carmine Sessa.  Id.  Aware of Sessa's resentment, the defendant conspired to assassinate Sessa on June 21, 1991.  Id. ¶ 45.  Although Sessa learned about Orena's plan to kill him and plotted to kill Orena instead, Sessa's plan failed.  Id.  Tenuous peace ensued until November 1991.  Id. ¶ 46.

On November 18, 1991, the defendant and his supporters violated the fragile truce in an attempt to kill Persico-loyalist Gregory Scarpa, Sr.  Following this attempt, the conflict erupted and members of both factions actively sought to kill members of the opposing faction.  Id. ¶ 47.  This war resulted in the attempted assassinations, woundings, or successful assassinations of at least 28 individuals.  In total, 12 people were killed — three of whom were innocent bystanders.  Id. ¶¶ 49, 60.  For instance, during the course of the violent conflict, 18-year-old Matteo Speranza was murdered while working in a bagel shop owned by two reputed Persico loyalists.  Id. ¶ 61.  Several other innocent bystanders were injured in the feud, including a murder victim's girlfriend who was struck by a bullet and three pedestrians, including a 4-year-old girl, who were hit by a car whose occupants were fleeing from an assassination attempt by gunmen.  See George James, Killing Tied to Mafia War in Brooklyn,  N.Y. Times, Dec. 9, 1991, available at https://www.nytimes.com/ 1991/12/09/nyregion/killing-is-tied-to-mafia-war-in-brooklyn.html.  Furthermore, as Judge Weinstein noted in an amended sentencing memorandum and order:  "Were it not for the fact that the New York police and Federal Bureau of Investigation had bugged their cars and hideouts and frustrated many of their ambushes, the death toll would have multiplied." United States v. Sessa, 821 F. Supp. 870, 872 (E.D.N.Y. 1993), aff'd sub nom. United States v. Amato, 15 F.3d 230 (2d Cir. 1994), and aff'd sub nom. United States v. Orena, 32 F.3d 704 (2d Cir. 1994), and aff'd, 41 F.3d 1501 (2d Cir. 1994).

As additionally established at trial, the defendant was responsible for the murder of Thomas Ocera in-aid-of racketeering.  Prior to his death, Thomas Ocera was an inducted member of the Colombo crime family.  Id. ¶ 51.  In connection with his membership in the family, Ocera collected extortion proceeds from various private sanitation companies, and Ocera was a partner with Orena in a lucrative loansharking business.  Id. ¶ 52.  In October 1989, law enforcement conducted a search of Ocera's business, during which they found records connecting the defendant and others to the loansharking business.  Id. ¶ 53.  In addition, Ocera was suspected of skimming profits from the crimes he was committing with the Colombo family.  Id. ¶ 55.  The defendant thereafter ordered the murder of Ocera.  Id. ¶ 56.  Ocera's decomposed body was found on October 3, 1991.  Id. ¶ 58.  A medical examiner concluded that Ocera's cause of death was strangulation.  Id.  Ocera was survived by a disabled wife with multiple sclerosis and three daughters.  Id. ¶ 59.

The defendant also played a role in operating several illegal gambling establishments, as well as loansharking operations.  Id. ¶ 62. Members of the crime family loaned money at illegally high rates of interest, charging between 2 and 5 percent weekly interest—equivalent to 104 to 250 percent annually.  Id.  Testimony at trial indicated that

Orena had $700,000 "on the street" (i.e., loansharking monies) and had received interest payments totaling $300,000 every year from 1986 to 1990. Id. ¶¶ 65-66.

Testimony also established that crime family members actively concealed firearms in their possession, and between 1991 and 1993, law enforcement recovered in excess of 90 firearms from individuals believed to be connected to the crime family conflict. Id. ¶ 49. And, indeed, when law enforcement agents arrested the defendant at his home in Valley Stream, New York, on April 1, 1992, they executed a judicially authorized search warrant of the residence. Agents recovered nine loaded firearms, ammunition, a bullet proof vest and confidential telephone records for members of the Persico faction. Id. ¶¶ 50, 70.

The jury ultimately found the defendant guilty of racketeering, in violation of 18 U.S.C. § 1962(c) (Count One); racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count Two); conspiracy to murder Thomas Ocera, in violation of 18 U.S.C. § 1959(a)(5) and New York Penal Law Sections 125.25 and 105.15 (Count Three); the murder of Thomas Ocera in-aid-of racketeering, in violation of 18 U.S.C. §§ 1959(a)(1) and (2) and New York Penal Law Sections 125.25 and 20.00 (Count Four); conspiracy to murder members of the Persico faction of the Colombo family in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(5) and New York Penal Law Sections 125.25 and 105.15 (Count Seven); conspiracy to make extortionate extensions of credit, in violation of 18 U.S.C. § 892 (Count Nine); conspiracy to make extortionate collections of credit, in violation of 18 U.S.C. § 894 (Count Ten); use and carrying of a firearm in relation to a crime of violence, specifically, Count Seven, in violation of 18 U.S.C. § 924(c)(1) (Count Eleven); and unlawful possession of firearms by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count Thirteen).

B.  Criminal History

Orena has two prior convictions in New York state criminal court. On May 11, 1976, Orena pleaded guilty to perjury in the first degree, in connection with lying in sworn grand jury testimony in an investigation related to assassination of Colombo crime family enforcer Joseph Gallo. On February 10, 1986, Orena pleaded guilty to conspiracy in the fifth degree to commit criminal usury (loansharking).

In addition to these convictions, as noted in the PSR, the government could also prove by a preponderance of the evidence that the defendant ordered the assassination of an individual named Gioachino "Jack" Leale for his purported blunder in concealing Ocera's murder. PSR ¶¶ 266-73. Following the discovery of Ocera's body, Leale was shot once in the back and six times in the head by several gunmen outside a hotel on Long Island. Id. ¶ 270. The government could show the defendant ordered Leale's murder for his failure to properly bury Ocera's body and to prevent Leale from testifying against the defendant at trial. Id. ¶ 272.

Furthermore, after the defendant's arrest and during his pretrial detention, he directed one of his children to contact a gun shop where Orena had illegally purchased a

3

shotgun, retrieve and destroy any records of the purchase and instruct the shop owner to make false statements to law enforcement. Id. ¶ 71.

C. The Court's Sentence

Following Orena's trial conviction, Judge Weinstein sentenced Orena to life imprisonment on Counts One, Two and Four, a sentence within the advisory Guidelines range. In a sentencing memorandum, Judge Weinstein articulated his rationale for imposing a life sentence:

> Considerations of incapacitation and general deterrence overwhelm all other factors in the sentencing of . . . Orena . . . . These are not quotidian cases. These mobsters, working within their own and with other mobs, have thrived in and cultivated a complex and pervasive culture of crime that infests and sucks dry entire communities and industries within this city and surrounding areas. Harsh terms of imprisonment are required to incapacitate defendants and extract them from the net of criminal activity in which they have been enmeshed for their adult lives and to which they no doubt would return at the first opportunity. Severe sentences may also by general deterrence save youngsters who might be seduced into the criminal lifestyle of these mobsters.
>
> The testimony in these three trials [of Orena and co-defendants Michael Sessa and Pasquale Amato] detailed the highly organized, structured nature of the Colombo and other mobs. The pervasive influence of the organized crime mobs in many of the formerly great industries of New York was made clear. The drain on the city's human and economic resources caused by this criminal activity has been a major factor in the deterioration of our social, political and economic infrastructure. The history of these families—their steady growth and repeated struggles for power internally and with each other—demonstrate that they are tenacious and will not easily be defeated. The culture of crime is potent. Its adherents know no other way.
>
> The direct and indirect costs of these gangs to the honest people of the metropolitan area are measured in the billions of dollars. Whole industries have been poisoned and adversely affected. Waterfront activities and traffic by ships, aircraft and trucks, building trades, garment trades, convention and theatrical facilities, restaurants and even politics are among the innumerable areas where these malefactors have operated. Using their loansharking and shakedown techniques they have gained control over numerous businesses, often driving them into

4

bankruptcy and causing the loss of great numbers of jobs. The direct costs to taxpayers of police surveillance and prosecutions run into the millions. And, of course, many individuals have been killed, maimed, or prevented from living in the peace and tranquility they were entitled to expect in our democratic society.

Incapacitation is the only means of preventing these defendants from perpetuating their criminal activity. Their past histories reveal them to be recidivists who cannot be rehabilitated. Their removal from society will prevent the further damage they are sure to cause and may have the added benefit of discouraging the inevitable successor generation that seems to arrive as soon as its forebears depart.

The testimony at trial revealed the extent to which mob life is shared and inherited through real families. Accomplice witnesses detailed how young, impressionable males in the Italian-American community have been lured into the destructive life of these mobs before they are able to recognize the better opportunities available to them. While court records indicate that the gangs themselves constitute only a miniscule percentage of this hard-working and law-abiding community, their reputations and representativeness have been grossly inflated to the detriment of the entire group. And they still are role models for a small—and decreasing—number of young men. It is tragic that even a relatively few young people with great potential for law-abiding lives should emulate these defendants and their ilk. Even when the aura of the mob was bright most youngsters in this community escaped from poverty of ideas and aspirations through education and hard legitimate work. Now, with university open admissions policies and numerous role models—to name but a few, the Governor of New York, an Associate Justice of the United States Supreme Court and the former Chancellor of the New York City Schools and Dean of the Cardozo Law School—it is more important than ever to stamp out this baleful group of ruthless and cruel parasites who too often are mistakenly thought of as representing their community.

The task of rooting out these criminals is arduous. They must be removed one-by-one through burdensome and expensive prosecutions that amount to a guerilla war on organized crime. The increased number of members of gangs willing to testify and the deterioration in the quality of their leadership and membership does show the utility and efficiency of the tenacious and sometimes brilliant work of law enforcement agencies. The

> cost of these gangs to society, both in terms of dollars spent and in terms of the drag on human resources in our court system, preventing the smooth administration of civil justice, remains great.
>
> Unrelenting pressure of hundreds of talented city, state and federal investigators over many years has now undermined the walls of secrecy surrounding these gangs. Many of their managing personnel now cooperate with the government. Sentences most severe are required if the final assaults on their citadels, while these gangs are disorganized and on the run, are to be successful. The tactics of Grant, not McClellan, are in order.
>
> The Guidelines are of little assistance in these cases. They focus myopically on mechanical aspects of the offenses. Their formulaic scheme fails to account for the overall picture of these defendants developed during three trials and in three thorough and exhaustive presentence reports. These criminals must be punished in the proper context of their lives and their overall actions, not in the vacuum of "units," "offense levels" and "adjustments" created by the Guidelines.
>
> These cases are extraordinary. Incapacitation and deterrence, 18 U.S.C. § 3553(a)(2)(B) and (C), far outweigh other factors encompassed by the statutes and Guidelines. All three defendants must be imprisoned for life. That the Guidelines require terms of life imprisonment demonstrates that appropriate sentences for these unusual defendants coincide with sentences meted out for those who have committed similar offenses in the past.

Sessa, 821 F. Supp. at 874-75.

   D.   Procedural Background

In 2020, the defendant filed a motion to vacate his conviction for use of a firearm in connection with a murder conspiracy. The government has conceded that the firearm conviction could not stand in light of the Supreme Court's decision in United States v. Davis, 139 S. Ct. 2319 (2019), requiring the Court to undertake a full de novo resentencing. Orena then sought to hold his motion in abeyance pending the outcome of a motion for compassionate release. ECF No. 1857. On May 17, 2021, the Court granted the defendant's request. The instant motion followed on July 19, 2021.

E.  The Motion for Compassionate Release

Orena, who is currently 86 years old, seeks compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i),[1] asking the Court to reduce his sentence to time served. He argues he is eligible for compassionate release based on "extraordinary and compelling" circumstances, namely his medical conditions, which are discussed below.

As an initial matter, the defendant states that his motion for release is ripe for consideration because he has exhausted his administrative remedies. On July 20, 2018, Orena filed an administrative request for compassionate release/reduction in sentence with Bureau of Prison ("BOP") officials at Federal Medical Center ("FMC") Devens, where he is currently housed, which was denied in a May 3, 2019 memorandum by the BOP assistant director/general counsel. See Def. Mem. Ex. 1 (filed under seal). The defendant again sought release, through his counsel, in a letter dated April 3, 2020, on the basis of his medical conditions ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ his advanced age and the COVID-19 pandemic.[2] See Letter dated April 3, 2020 from David Schoen to Warden Stephen Spaulding, attached hereto as Government Exhibit B. In a letter dated May 18, 2020, the warden at FMC Devens noted that while Orena meets the BOP's medical criteria for a reduction in sentence, Orena's request was denied due to the nature and circumstances of his offense and criminal history. See Letter dated May 18, 2020 from Warden Stephen Spaulding to Orena, attached hereto as Government Exhibit C.

In the instant motion to the Court, the defendant primarily asserts that he eligible for release because he suffers from ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Def.

---

[1] Orena contends in a footnote that he may also be eligible for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(ii) if the Court considers the "spirit of that provision," and not its plain language. Def. Mem. at 5 n.4. Subsection (ii) permits eligible for release if the defendant (1) was sentenced to mandatory life under the "three strikes" provision codified at 18 U.S.C. § 3559(c); (2) is more than 70 years old and (3) has served 30 years in prison. Orena concedes he was not sentenced to mandatory life imprisonment under the "three strikes" provision and has not yet served more than 30 years in prison. Accordingly, to the extent the defendant seeks release under subsection (ii), Court should find that he is not eligible.

[2] The government respectfully requests that a redacted version of this letter be filed publicly, sealing this select portion of the motion that reveals health information protected by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") that has not otherwise been disclosed in the defendant's public filings. See Offor v. Mercy Med. Ctr., 167 F. Supp. 3d 414, 445 (E.D.N.Y. 2016) ("Courts in this Circuit have repeatedly held that information protected by HIPAA is not subject to a First Amendment or common-law right of access and thus have sealed docket entries and redacted documents that contain such information."), vacated in part on other grounds, 676 F. App'x 51 (2d Cir. 2017).

7

Mem. at 6, 10.  Orena also argues he suffers from other medical conditions, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Def. Mem. at 8.  In addition, Orena argues that given his medical conditions, he is at a heightened risk for serious illness if he again contracted COVID-19 due to "the close quarters of an institutional setting." Id. at 8-10.

Orena enumerates several other factors that he argues may fulfill the "extraordinary and compelling circumstances" standard, including sentence disparities and purportedly exculpatory evidence, see Def. Mem. at 6, but fails provide any additional information about these claims or why they constitute "extraordinary and compelling circumstances" here.

As to the Section 3553(a) factors, Orena argues that his 29-year sentence, institutional record, efforts at rehabilitation while in prison and BOP risk assessment level of "minimum" weigh in favor of his motion for release.

## II. Legal Framework

### A. The Compassionate Release Standard

"A district court may not generally modify a term of imprisonment once it has been imposed," except pursuant to a statutory grant of authority.  United States v. Savoy, 567 F.3d 71, 72 (2d Cir. 2009) (internal quotation marks omitted); see also United States v. Bernabal, 22 F. App'x 37, 41 (2d Cir. 2001) (quoting United States v. Mendoza, 118 F.3d 707, 709 (10th Cir. 1997) and collecting cases). Section 3582(c) is one source of such authority.

Section 3582(c)(1)(A)(i) permits a court to modify an already imposed sentence upon a showing of "extraordinary and compelling reasons."[3]  Specifically, a court may "modify a term of imprisonment" when, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," and to the extent a reduction is consistent with the applicable policy statement in the Sentencing Guidelines, the court "finds that extraordinary and compelling reasons warrant such a reduction."  See 18 U.S.C. § 3582; see also United States v. Gotti, 433 F. Supp. 3d 613, 615 (S.D.N.Y. 2020).  As the district court noted in Gotti, "a defendant who meets all the criteria for compassionate release consideration listed above is not thereby automatically entitled to a sentence modification. He is simply eligible for a sentence modification." Id.  A court still must consider the Section 3553(a) factors, and even if extraordinary and compelling circumstances may exist, the court may deny the defendant's motion for relief.  Id.

---

[3] The statute also requires the inmate to exhaust administrative remedies, but as indicated below, the government does not contest exhaustion here, so these requirements are not discussed.

8

The 3553(a) factors include: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) "the need for the sentence imposed" to serve the purposes of sentencing, including punishment, deterrence, protection of the public, and rehabilitation; (3) the Sentencing Guidelines and (4) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a).

The Sentencing Guidelines and BOP policy have set forth clear criteria to aid in a court's determination of when compassionate release is appropriate pursuant to Section 3582(c)(1)(A)(i). See U.S.S.G. § 1B1.13; see also BOP Program Statement 5050.50 ("Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)"), available at https://www.bop.gov/policy/progstat/5050_05 0_EN.pdf. Both the Guidelines and the BOP Program Statement primarily limit compassionate release to cases of serious illness or impairment, advanced age, or a need to care of a child, spouse or registered partner. See id. (defining criteria applicable to "Terminal Medical Condition(s)," "Debilitated Medical Condition(s)," and "Elderly Inmates with Medical Conditions," among others); see also United States v. Traynor, No. 04 CR 582 (NGG), 2009 WL 368927, at *1 n.2 (E.D.N.Y. Feb. 13, 2009). As the Court recognized in Traynor, Congress indicated that Section 3582(c)(1) "applies . . . to the unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of the prisoner." Id. at *1 (citing Sen. Rep. No. 98-225, 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 3182, 3304).

In 2020, the Second Circuit in United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020), provided additional guidance to district courts on what constitutes extraordinary and compelling circumstances. The Circuit explained the district court may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release," finding the Guidelines policy statements "cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling." Id. at 236. Since the Second Circuit decided Brooker, several Circuits have reached similar conclusion about defendant-filed motions for compassionate release. See, e.g., United States v. McCoy, No. 20-6821, 2020 WL 7050097 (4th Cir. Dec. 2, 2020); United States v. Shkambi, 993 F.3d 388, 393 (5th Cir. 2021); United States v. Jones, 980 F.3d 1098, 1100 (6th Cir. 2020); United States v. Gunn, 980 F.3d 1178, 1180 (7th Cir. 2020); United States v. Aruda, 993 F.3d 797 (9th Cir. 2021); United States v. McGee, 992 F.3d 1035, 1050–51 (10th Cir. 2021); but see United States v. Bryant, No. 19-14267, 2021 WL 1827158, at *14 (11th Cir. May 7, 2021) (holding district courts are bound by § 1B1.13).

III. Discussion

While the defendant's plethora of medical conditions arguably meet the threshold "extraordinary and compelling reason" requirement for the Court to consider the defendant's request under § 1B1.13, consideration of the 18 U.S.C. § 3553(a) factors indicates that his release is not warranted here. See 18 U.S.C. § 3582(c)(1)(A). The Court

9

should deny Orena's application given the serious nature of his offenses, which included the murder of one individual and a plot to kill a dozen more as the acting head of the Colombo crime family; his disregard for the law and human life; and the need to ensure adequate punishment, deterrence and protection of the community. Simply put, reducing Orena's sentence would minimize the nature and seriousness of his offenses and diminish the integrity of our justice system.

> A.   Nature and Circumstances of the Offense

It is not possible to overstate the seriousness of the defendant's conduct. For most of his adult life, Orena associated with and identified as a member of the Colombo crime family, a group which has profited through crime and enforced its actions with violence. As Judge Weinstein noted, "These mobsters, working within their own and with other mobs, have thrived in and cultivated a complex and pervasive culture of crime that infests and sucks dry entire communities and industries within this city and surrounding areas." Sessa, 821 F. Supp. at 874. These criminal organizations, including the Colombo crime family, continue to affect New York City to this day.

To be sure, the defendant was not merely a member of this criminal enterprise. He rose through the ranks to become its de facto leader, and when his position, income and reputation were threatened, he plotted to kill a rival, precipitating a years-long immensely violent conflict. Indeed, this conflict claimed 12 lives, threatened dozens more and flooded city streets with firearms. Three of those victims were innocent bystanders whose deaths resulted from Orena's senseless power struggle. Although the other nine victims were affiliated with organized crime, they too are victims deserving of justice.

The defendant used his leadership position within the Colombo crime family not just to incite deadly violence among its members but also to order the deaths of specific individuals. Specifically, Orena ordered his subordinates to murder Ocera, who was subsequently strangled to death after which his body was not discovered for nearly two years. The defendant later ordered the murder of Leale, the man the defendant used to carry out Ocera's assassination, in part as punishment for the discovery of Ocera's decomposing corpse.

This Court should deny compassionate release for this defendant who stands convicted of serious and violent offenses in his role as an organized crime syndicate, joining other Courts who have denied such applications by other violent members of organized crime syndicates. For instance, in United v. Brunetti, 2020 WL 4516541 (E.D. Pa. July 31, 2020), the district court denied relief for a 73-year-old mafia member who had served 26 years of a 40-year sentence. That court found that the defendant had serious medical conditions that could qualify as extraordinary and compelling reasons for release: a history of tumors in his chest, persistent pain after surgery to remove those tumors, frequent shortness of breath, serious eye conditions, coronary artery disease and a heightened risk for cardiovascular accident or stroke. Id. at *7. The court determined, however, that despite these conditions, the defendant's "serious crimes" — his long-time affiliation with organized crime and his roles in two attempted murders and a conspiracy to murder twelve members of

10

the rival enterprise — made him ineligible for early release. Id. at *3, *10. Similarly, Judge Garaufis denied a motion seeking sentence reduction by a defendant who was involved in organized crime for over thirty years as an employee and high-ranking member of the Bonnano crime family and had engaged in extortion, illegal gambling and murder. See United States v. Urso, No. 03-CR-1382 (NGG), 2019 WL 5423431, at *3 (E.D.N.Y. Oct. 23, 2019); see also United States v. Gotti, 433 F. Supp. 3d 613, 619-20 (S.D.N.Y. 2020) (denying motion to reduce sentence of former leader of the Gambino crime family despite his serious, debilitating, and progressive medical conditions due to the violent nature of his offenses).

Courts have also denied release for defendants convicted of violent offenses, including murder, outside the realm of organized crime. See, e.g., United States v. Arana, 2020 WL 2214232 (E.D. Mich. May 7, 2020) (denying motion to reduce life sentence despite defendant's acute pancreatitis, which left him wheelchair-bound, and other conditions, due to the nature of his offenses, which included murder-for-hire); United States v. Epstein, 2020 WL 2537648 (D.N.J. May 19, 2020) (denying motion for 74-year-old defendant in poor health because his conduct involved years-long conspiracy that included multiple violent kidnappings); United States v. Martin, 2020 WL 3960433 (E.D. Pa. July 13, 2020) (denying motion for 66-year-old defendant with chronic obstructive pulmonary disease, asthma and heart disease who had been convicted of felony murder and two bank robberies serving a three-strikes life sentence, due to his violent history).

Here, Orena's criminal conduct involved "the ultimate violence, the taking of a human life." Arana, 2020 WL 2214232, at *6. Life in prison is a proportionate and just punishment for the defendant's crimes.

B. History and Characteristics

The "history and characteristics of the defendant" and the need to protect the public from his further crimes also weigh against Orena's release.[4]

Orena's criminal history includes two convictions that stemmed from his association with the mafia (and further evidence his long-standing involvement in organized crime), in addition to many other arrests, see PSR ¶ 274-89, and an attempt to obstruct justice following his arrest in the instant case, by trying to conceal his illegal purchase of a gun after his arrest in the instant case. As explained, the defendant was not simply a member of the

---

[4] Historically, courts evaluating motions for compassionate release have analyzed whether the defendant poses a danger to another person or the community under U.S.S.G. § 1B1.13. The Circuit's decision in Brooker held that § 1B1.13 is not properly applied to defendant-filed motions for compassionate release. Brooker, 976 F.3d at 235-36. Another Circuit that reached the same result as Brooker has suggested that in light of this holding, the danger analysis is now properly conducted under the Section 3553(a) factors. United States v. Long, 997 F.3d 342, 356-57 (D.C. Cir. 2021). Therefore, the government addresses the danger Orena poses to the community under the Section 3553(a) factors.

11

Colombo crime family — he rose through its ranks and sought to take and keep power from his rivals. In his motion, Orena does not address his long-standing connection to organized crime, his crimes of conviction, nor does he express regret, let alone remorse, for either.

The court must also assess the relevant characteristics of the defendant — here, Orena's well-documented medical conditions, the need to provide care in the most effective manner and his efforts at rehabilitation. None of these considerations weigh in favor of release.

First, while the defendant's medical conditions require ongoing care, he has not asserted, much less demonstrated, that FMC Devens is unable to provide him with that care. See generally Medical Records from July 17, 2021 to April 29, 2021, attached hereto as Government Exhibit A (filed under seal).[5] Many courts, including three Circuits, have denied early release to inmates with terminal medical conditions.[6] For instance, in United States v. Chambliss, 948 F.3d 691 (5th Cir. 2020), the Fifth Circuit affirmed the district court's denial of a compassionate release motion from an inmate with terminal liver cancer after considering the defendant's "severe" conduct, his serious drug crime, and his criminal history, which included aggravated robbery. Id. at 694. Similarly, in United States v. Wright, 991 F.3d 717 (6th Cir. 2021), the Sixth Circuit affirmed the district court's denial of a compassionate release motion from an inmate with end-stage renal disease who had committed murder, stolen airplanes and conducted business with a drug cartel. Id. at 719. In United States v. Levine, 834 F. App'x 242 (7th Cir. 2021), the Seventh Circuit affirmed the

---

[5] As defense counsel notes, Orena's medical records are voluminous, numbering at nearly 3,500 pages for the last two-and-a-half years. The government has provided the last two-and-half months of medical records and can provide additional records under seal if they would aid in the Court's determination. The government respectfully requests it file Exhibit A under seal because it contains health information protected by HIPAA that has not otherwise been disclosed in the defendant's public filings. See Offor, 167 F. Supp. 3d at 445.

[6] Orena relies on several case in which courts have granted compassionate release for defendants suffering from serious medical conditions. However, these cases lack the violence and loss of life that marked Orena's crimes of conviction. See, e.g., United States v. Lochmiller, 473 F. Supp. 3d 1245, 1248 (D. Col. 2020) (granting compassionate release to a defendant who operated a non-violent Ponzi scheme); United States v. Jaen, 2020 WL 4209283 (S.D. Fla. July 6, 2020) (granting compassionate release for defendant who trafficked 600 kilograms of cocaine); United States v. Champagne, 2020 WL 3472911 (D. N.D. June 25, 2020) (granting compassionate release to defendant convicted of assault resulting in serious bodily injury and being a felon-in-possession of a firearm and sentenced under Armed Career Criminal Act); United States v. McGraw, 2019 WL 2059488, *5 (S.D. Ind. May 9, 2019) (granting compassionate release for defendant convicted of conspiracy to possess with intent to distribute methamphetamine); United States v. Rice, 2020 WL 4505813, *4 (S.D.N.Y., August 5, 2020) (granting compassionate release to defendant convicted of racketeering and narcotics crimes).

district court's denial of a compassionate release motion from an inmate with cancer (which was in remission at the time) after considering his triple murder-for-hire scheme. Id. at 244; see also United States v. Webster, 2020 WL 618828 (E.D. Va. Feb. 10, 2020) (denying relief for inmate suffering from terminal cancer due to the heinous nature of his criminal history involving two murders).

Nor does the defendant's institutional record or his effort at rehabilitation militate toward release. Although Orena has no disciplinary infractions and notes involvement in some religious activities in 1997 and 2004, see Def. Mem. at 13, courts have denied similar motions from inmates with much more extensive rehabilitation efforts. For instance, in United States v. Spencer, the district court found the defendant's commission of and conviction for violent robberies outweighed his efforts at rehabilitation, which included earning his GED, serving as a suicide-watch companion and working for UNICOR, which provides job training and practical work skills for reentry. No. CR 95-659, 2020 WL 6504578, at *2 (E.D. Pa. Nov. 5, 2020) (denying motion for release from life sentence for ten armed robberies given the serious nature of his offenses and criminal record). By comparison, the defendant's limited rehabilitation efforts do not tip the scale here.

Finally, it is clear that defendants with robust connections to organized crime may still pose a danger to the community despite advanced age or declining faculties. For instance, in Gotti, the district court denied a motion for compassionate release from a defendant, "a sickly, soon to be octogenarian," who headed the Gambino crime family and personally ordered the death of a government cooperator. 433 F. Supp. 3d at 620. The court specifically rejected the notion that the defendant was no longer a threat to the community, explaining the danger "is not that he will personally engage in violence but that he can command others to do so." Id. (noting at that sentencing, the court found "[b]osses don't commit violence themselves, they have subordinates to do their bidding."); United States v. Levine, 834 F. App'x at 243 (noting murder-for-hire requires little physical agility or youth, so the defendant could commit "further horrific acts"). Orena was convicted of ordering others to kill and commit violent acts. Although the defendant may assert that his ▮▮▮▮ ▮▮▮▮ reduces the likelihood of his violence upon released, he does not contest that he "suffers from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Def. Mem. Ex. 1 at 1-2 (filed under seal).

C. The Need for the Sentence Imposed

One of the most compelling reasons to deny the defendant's request for release is the need for the sentence imposed. In imposing life imprisonment, Judge Weinstein noted just punishment and deterrence weighed heavily in favor of the lengthy prison sentence. He wrote, "[c]onsiderations of incapacitation and general deterrence overwhelm all other factors in the sentencing of . . . Orena," who had been fully enmeshed in the "net of criminal activity" for his adult life. Sessa, 821 F. Supp. at 874. Judge Weinstein found Orena's severe sentence "may also by general deterrence save youngsters who might be seduced into the criminal lifestyle of these mobsters." Id.

Courts have relied on this factor in denying motions for a sentencing reduction when granting the motion "would minimize the nature and seriousness of the offense." United States v. Logan, 2020 WL 730879 (W.D. Ky. Feb. 13, 2020) (denying motion of 81-year-old defendant who suffers from prostate cancer, glaucoma, blindness, diabetes, and other medical conditions, and has served more than 22 years of his life sentence); see also Walker v. United States, 2020 WL 2308468 (S.D. Fla. May 8, 2020) (denying motion of defendant with serious health issues because of the need to ensure adequate punishment, deterrence, and community protection); United States v. Stanley, 2020 WL 6060877 (M.D. La. Oct. 14, 2020) (denying motion of defendant unable to move without wheelchair operator because of the seriousness of his robbery offenses and the need for adequate deterrence). As the district court noted in Gotti, an early release in that case would have undermined the goals of sentencing as "the integrity of our justice system demands a sentence sufficient to punish the defendant for his crimes and to deter others who might consider following in his path." 433 F. Supp. 3d at 620 (quoting Casey, J. sentencing transcript 23:22–25). The same stands true in this case, for this defendant.

### D. Unwarranted Sentencing Disparities

The defendant also argues that granting his motion would reduce unwarranted sentencing disparities. However, section 3553(a)(6) speaks of "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6); see also United States v. Conatser, 514 F.3d 508, 521 (6th Cir. 2008) (citations omitted) (noting this factor "concerns national disparities between defendants with similar criminal histories convicted of similar criminal conduct"). Comparing Orena's life sentence to those sentences imposed on other defendants convicted in connection with their leadership of a major organized crime family indicates Orena's sentence is not aberrant. For instance, John Gotti, the Gambino crime family boss, was convicted in 1992 and sentenced to life imprisonment. No. 90-CR-1051-ILG (E.D.N.Y.). Carmine Persico, the long-time official boss of the Colombo crime family, was convicted in 1986 and sentenced to 139 years' imprisonment. No. 85-CR-139 (S.D.N.Y.). Anthony Corallo, the boss of the Lucchese crime family, was convicted in 1986 and sentenced to 100 years' imprisonment. No. 86-CR-139 (S.D.N.Y.). Anthony Salerno, the boss of the Genovese crime family, was convicted in 1987 and 1988 and sentenced to 100 and 70 years, respectively. No. 85-CR-139 (S.D.N.Y.) and 86-CR-245 (S.D.N.Y.).

* * *

Because of this case's reassignment, this Court has the difficult task of evaluating these factors without having presided over three trials in the early 1990s which laid out in explicit detail Orena's heinous conduct and his role as the acting boss of the Colombo crime family. Therefore, the government urges the Court to consider Judge Weinstein's words at Orena's sentencing: "These cases are extraordinary. . . . [Orena] must be imprisoned for life." In determining that a life sentence was appropriate here, Judge Weinstein was aware that Orena would likely die in prison. The reasons behind Orena's life sentence are no less

true today than they were at the time of his sentencing. Accordingly, maintaining the defendant's sentence comports with the Section 3553(a) factors.

IV. Conclusion

For the reasons set forth above, the defendant's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) should be denied.

Respectfully submitted,

JACQUELYN M. KASULIS
Acting United States Attorney

By:    /s/ Devon Lash
Elizabeth A. Geddes
Devon Lash
Assistant U.S. Attorneys
(718) 254-7000

cc: David Schoen, Esq. (Counsel to the defendant) (by ECF)
Defendant Victor J. Orena (FMC Devens) (by Certified Mail)