David I. Schoen
Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone: 334-395-6611
Facsimile: 917-591-7586
E-Mail: Schoenlawfirm@gmail.com

July 5, 2023

Honorable Eric R. Komitee
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201     Re: *U.S. v. Orena*; 92-cr-351 (EK) (Related: 20-cv-4548 (EK))
*   Via ECF   *

Dear Judge Komitee:

      I represent Mr. Victor Orena, in the above-referenced case. On June 27, 2023, the Court entered a Text Order advising the parties that it was converting what was supposed to be Mr. Orena's July 6th re-sentencing hearing into a status conference to be held on the same date. The Text Order also directed the parties "to be prepared to discuss the need for, and timing of any, resentencing." I am writing in advance of the status conference to provide the Court with an outline of Mr. Orena's position on the matter, with the hope that it would be helpful to the Court to have an idea in advance for his position and the bases for it. I incorporate herein all previous filings and will be prepared to address additional issues at the status conference.

      I will first address the procedural posture and then the substantive issues, including the matters addressed in the government's June 26, 2023 letter to the Court [ECF# 1926]. Mr. Orena's position is that, for all relevant and compelling reasons and consistent with the decision in *United States v. Pena*, 58 F.4th 613 (2d Cir. 2023), there must be a full resentencing.[1]

---

[1] The Second Circuit originally issued its decision in *Pena* on December 13, 2022. 55 F.4th 367 (2d Cir. 2022). On January 27, 2023, the Court issued an amended opinion in *Pena* that superseded that decision. 58 F.4th 613 (2d Cir. 2023). *Pena* is, of course, binding authority in this Circuit at present (Mr. Orena reserves his right to challenge its application). Under *Pena*, this Court indisputably has full authority to conduct a *de novo* re-sentencing for Mr. Orena as originally contemplated and as agreed to by the government continuously from 2020 until June 26, 2023. Indeed, as the Court in *Pena* expressly acknowledged, the discretion to **not** conduct *de novo* resentencing "has limits" and in "most cases" in which resentencing would not be "strictly ministerial" it may be an abuse of discretion to deny a *de novo* resentencing. *See Pena*, 58 F.4th at 623. Mr. Orena also respectfully submits that the decisions in *Concepcion v. United States*, – U.S. –, 142 S. Ct. 2389, 2400-2404, 213 L. Ed. 2d 731 (June 27, 2022) and *United States v.*

**Procedural Posture**

At all times until June 26, 2023, both before and after the decision in *Pena*, it has been the government's position that this Court should conduct a *de novo* resentencing of Mr. Orena in this case.

**Relevant Facts Prior to *Pena***

On September 24, 2020, the Second Circuit's Mandate was filed in this Court, remanding the case pursuant to *United States v. Davis*, 139 S. Ct. 2319 (2019), requiring that the count of conviction under 18 U.S.C. §924(c) be vacated. [ECF# 1849]. On that same date, Mr. Orena filed his successive Motion to Vacate under 18 U.S.C. §2255, as directed by the Second Circuit. [ECF# 1850].

On October 15, 2020, the government filed its response to the Court's September 25, 2020 Order to Show Cause [ECF# 1851]. In its response, the government asserted, *inter alia*, that the count of conviction at issue "must be vacated and the Court **should** undertake a **full resentencing** of Orena." [ECF# 1852 at 1 & 7] (emphasis added). This was confirmed in Mr. Orena's November 5, 2020 reply [ECF# 1853].

On April 29, 2021, the Court directed the government to advise the Court of its position on scheduling vis a vis a motion for compassionate release and the resentencing. The Court also directed the Probation Department to prepare an updated PSR [ECF# 1855]. On April 30, 2021, the government filed its response reiterating its position that Mr. Orena was entitled to a full resentencing and expressly suggesting that one option would be to proceed to resentencing and at the resentencing proceeding the Court could consider "... the same factors that give rise to any motion for compassionate release that the defendant may seek to file." [ECF# 1856 at 1-2].

On May 13, 2021, I filed Mr. Orena's response to the Court's May 12, 2021 Text Order directing Mr. Orena to advise the Court whether it wishes to hold vacating the conviction and the imposition of a "new sentence" in abeyance, while a compassionate release motion is pursued. Mr. Orena responded that this did, indeed, seem like the most efficient way to proceed (especially in light of his medical condition) and advised that he would proceed in that manner. [ECF# 1857]. Both the Text Order and the response were expressly premised on having a *de novo* resentencing in the case at some point. The Court's August 19, 2021 and September 20, 2021 Scheduling Orders also expressly contemplated conducting a resentencing, with the latter noting that the government "concedes" that there must be a resentencing, and holding it in abeyance at the defendant's request in order to proceed with the compassionate release motion

---

*Quintieri*, 308 F.3d 1217, 1227-28, 1230 (2d Cir. 2002) and their emphasis on the appropriateness of sentencing a defendant based on all operative factors at the time he stands before the Court, whether for initial sentencing or a modification of sentence, weighs heavily in favor of a *de novo* sentencing in this case as well.

2

first.

On February 10, 2022, in its brief on Mr. Orena's appeal from the denial of the §3582 motion arguing against compassionate release, the government acknowledged to the Second Circuit that it agreed that this Court must undertake a full resentencing and that the resentencing was being held in abeyance pending the outcome of the §3582 motion. [See Second Circuit Docket No. 21-2747, Doc. 49 (3259313) at Page 23 of 53]. The Second Circuit's Mandate affirming this Court's denial of the §3582 motion was filed on November 28, 2022 [ECF# 1910].

### Relevant Facts Since the Decision in *Pena*

As noted, the Second Circuit issued its decision in *Pena* December 13, 2022 and amended it on January 27, 2023. Despite knowing it had expressly agreed to a full *de novo* resentencing in this case and that it had been held in abeyance pending the outcome of the §3582 motion, the government filed nothing in this Court indicating in any way that its position had changed or that for any reason the agreed upon full *de novo* resentencing should not take place for Mr. Orena, even after *Pena*.[2]

On April 5, 2023, this Court entered a Text Order directing Mr. Orena to file a status report.

On April 14, 2023, I filed Mr. Orena's status report, recounting the procedural history, the agreement by all involved that there should be a full *de novo* resentencing and requesting an updated PSR, with an opportunity to file objections [ECF# 1922]. The government filed no response and in no way indicated it opposed the previously agreed upon *de novo* resentencing, notwithstanding the decision in *Pena*, four months earlier.

---

[2] The government cannot credibly contend that it somehow was not aware of the decision in *Pena*. It was a party to multiple cases in this District in which *Pena* expressly was addressed by the courts, beginning in December of 2022, in the specific context of analyzing whether, after *Pena*, the court should conduct a full resentencing after a §924 count of conviction was vacated pursuant to a §2255 motion, and considering which of the options open to the court the court should apply, based on the circumstances of each case. *See e.g., United States v. Naseer*, 2022 U.S. Dist. LEXIS 226246, *3-*5, 2022 WL 17718800 (E.D.N.Y., December 15, 2022) (noting that after *Pena*, the court may, but is not required to hold a *de novo* resentencing; entering a corrected sentence without a *de novo* proceeding because the same judge presided over the trial, sentencing, and post-conviction proceedings); *United States v. Abu Mezer*, 2023 U.S. Dist. LEXIS 3512, *8-*9, E.D.N.Y., January 9, 2023) (noting options after *Pena*; opting to correct sentence in lieu of *de novo* resentencing when only basis for a successive §2255 motion was vacating §924(c) count); *United States v. Bernard*, 2023 U.S. Dist. LEXIS 6804, *6-*7, 2023 WL 184443 (E.D.N.Y., January 13, 2023) (Discussing options under *Pena* and ordering *de novo* resentencing following the vacating of §924 counts).

3

On April 21, 2023, the Court issued a Text Order scheduling Mr. Orena's resentencing hearing for July 6, 2023 and directing the Probation Office to provide Mr. Orena with an updated PSR by May 22, 2023. Again, there was no issue raised by the government that in any way indicated it was reneging on its agreement that there should be a full *de novo* resentencing.

On May 24, 2023, the Probation Department provided me with its partially updated PSR and on June 7, 2023, Mr. Orena timely filed and served his objections to the PSR, with a copy both to the Probation Department and to government counsel [ECF# 1924]. Notwithstanding both the timing requirements under F.R.Cr.P. 32 and this Court's earlier direction to government counsel to respond to any objections to the PSR within two weeks [ECF# 1855], the government filed no response at all to the objections to the PSR. Nor did the government in any way indicate any objection to going forward with the full *de novo* resentencing that it agreed upon, that it knew Mr. Orena and the Probation Department were preparing for and that this Court had scheduled, now approximately six months after the *Pena* decision and after having the issue arise in multiple cases since *Pena* was decided.

On June 21, 2023, the Court entered a Text Order addressing some aspects of the defense objections to the PSR, asking for additional information with respect to one category of objections, asking whether Probation should conduct an interview of Mr. Orena or his family, and asking whether the defense would be amenable to adjourning the July 6th resentencing to a later date to enable the Probation Department to further update the PSR based on the objections. The Court allowed two days for a response to the Order. The government filed nothing indicating any objection to going forward with the *de novo* resentencing.

On June 23, 2023, I filed Mr. Orena's response to the Court's Text Order, addressing each question and indicating that since, realistically, the only way to have a truly updated PSR would be to have the July 6th date adjourned to permit the Probation Department to do its work in preparation for the *de novo* resentencing, Mr. Orena would be amenable to such an adjournment [ECF# 1925].

On June 26, 2023, over six months after the decision in *Pena*, and over six months after *Pena's* impact on the remedial options following the vacating of a §924 conviction had been raised and discussed in multiple cases in this district to which this same prosecuting office was a party, government counsel for the first time contended, notwithstanding the agreement to the contrary which it acknowledges, that this Court should decide under *Pena* not to conduct a resentencing for Mr. Orena [ECF# 1926].

### **Recent Communications**

In addition to all of the foregoing filings and proceedings all premised on the agreement of the parties and the Court's Orders that there would be a full *de novo* resentencing, to which the government never before indicated in any way, shape, or form that it would attempt to contravene, the undersigned has been in regular communication by email and by telephone with

4

government counsel concerning the logistics for the resentencing and not once has government counsel ever in any way taken a position that Mr. Orena is not entitled to the full *de novo* resentencing contemplated at all times and on which earlier procedural decisions expressly had been premised.

For example, on June 2, 2023, I received a call from an AUSA McDonald who advised that he was calling to confirm that the defense wanted Mr. Orena brought in from FMC Devens for the resentencing proceeding. I confirmed that we did.

This was, of course, consistent with email exchanges among the parties and the Court initiated by the Court staff, including emailed confirmation by the government to the Court that they would be making the necessary arrangements. On June 13, 2023, I received an email from government counsel asking me to call her. I returned the call on June 14, 2023, and again the subject was Mr. Orena's transportation to the Court for the resentencing - not whether there should be a resentencing. Government counsel advised that the officers at FMC Devens had asked whether we would agree to have Mr. Orena appear for his resentencing by video and I was advised that counsel would make an effort for me to have a video call with Mr. Orena to discuss this option. The concern raised was over care for his medical needs en route and during his stay for the resentencing hearing.

On June 15, 2023, I received a call from an officer at FMC Devens who advised that he could not set up a video call for me with Mr. Orena, but could set up a phone call through Mr. Orena's case manager. I discussed transportation and housing logistics and Mr. Orena's ability to handle them with the first officer and the case manager. I then had a phone call with Mr. Orena who reiterated his wish to be present in person for his resentencing hearing and indicated that he felt he could handle the transportation and housing. I followed up with an email to government counsel confirming that we would need him to be brought in for the resentencing hearing.

On June 20, 2023, government counsel called me to follow up on my June 15th email. Government counsel advised that the Marshal service would be making the arrangements for Mr. Orena's participation in the resentencing hearing in person and she raised the issue of Mr. Orena's competency. I advised that, as I wrote in papers filed earlier in the case, I continued to have a question about Mr. Orena's ability to assist and to understand, based on his advanced (terminal) dementia; but I advised that I am not qualified to give any definitive opinion on the matter and I did not want to proceed on that premise if the result would be having him institutionalized for the rest of his life. I suggested perhaps bringing that issue to the Court's attention, but I was not sure the Court could offer any definitive answer either. Government counsel advised that she would check with supervisors and either get back to me or file something on the competency issue. Again, at no time was there ever any issue raised about whether there should be a resentencing under *Pena*.

On June 21, 2023, government counsel wrote me an email advising that she would be

5

filing a letter with the Court seeking a "competency evaluation for Mr. Orena before the re-sentencing can take place." Government counsel asked me to advise her as to my position on that request before the close of business. No mention whatsoever was made that the government would be taking the position that there should be no resentencing under *Pena* or for any other reason. Indeed, the only issue raised was the matter of Mr. Orena's competency to participate in the resentencing hearing. Within 15 minutes, I responded to the email by asking government counsel to advise the Court in her letter that the defense opposes the request for a competency evaluation prior to the resentencing and that I would file a response to her letter explaining the defense position.

On June 26, 2023, without any notice, and contrary to all previous filings in this case over the past 2.5 years, contrary to the premise for all previous scheduling decisions on the order of proceeding (in light of Mr Orena's terminal condition), and contrary to all communication between counsel, the government, for the first time, took the position that the Court should not conduct any resentencing proceeding for Mr. Orena based on the *Pena* decision issued six months ago [ECF# 1926].

The Court should reject the government's position out of hand based on its untimeliness, the defense's reliance at all times on its agreement and the order of proceeding directed by the Court, the government's waiver of any such position by not raising it earlier, knowing Mr. Orena was relying on its agreement to the contrary, and for the substantive reasons provided below, consistent with the Court's discretion under *Pena* and with the principles enunciated in *Concepcion*, and *Quintieri*.

**The Fair Exercise of the Court's Discretion Under *Pena* Requires *De Novo* Resentencing**

In *Pena*, the Court held that when a count of conviction is overturned on a successive §2255 motion, a full *de novo* resentencing hearing is not mandatory; rather it is, with limits, left to the district judge's discretion whether to "discharge the prisoner or resentence him or grant a new trial, or correct the sentence as may appear appropriate." *United States v. Bernard*, 2023 U.S. Dist. LEXIS 6804, *6, *citing* 28 U.S.C. §2255(b) (E.D.N.Y., January 13, 2023) (exercising its discretion in favor of full *de novo* resentencing).

The defendant in *Pena* was sentenced to five concurrent terms of life imprisonment, three of which carried mandatory sentences of life imprisonment and two of which (the §924(j) counts), were punishable by life imprisonment. *Pena*, 58 F.4th at 617. The court vacated the two §924 counts on a successive §2255 motion; however, on remand, the district court exercised its discretion to simply correct the sentence, rather than conduct a *de novo* resentencing, where the vacatur still left the defendant Pena with three counts that carried mandatory life sentences.

The Second Circuit affirmed, finding first, that under such circumstances, the district judge has discretion as to the remedy (based on 18 U.S.C. §2255(b)) and secondly, that where, as in the circumstances of that case, there would no sentencing discretion at any resentencing, since

6

the counts that remained intact carried mandatory life sentences, any resentencing would be "strictly ministerial.[3]" Therefore, it was not an abuse of discretion to fail to a hold a full *de novo* resentencing under the operative circumstances. *Pena*, 58 F.4th at 615, 623. The Second Circuit noted, however, that the discretion to avoid a full *de novo* resentencing "has limits" and that "[I]t may be that in most cases in which resentencing would not be strictly ministerial, a district court abuses its discretion when it denies *de novo* resentencing." *Id*. at 623.

In Mr. Orena's case resentencing is in no way "strictly ministerial." There is no mandatory life sentence involved here. Moreover, he was sentenced under a Guidelines system that was mandatory at the time of his original sentencing. That no longer is the case and that clearly makes a major, significant difference.[4] Mr. Orena must be resentenced under the advisory Guidelines system and with full consideration of the factors under 18 U.S.C. §3553(a) as he now stands before the Court. To fail to give conduct a *de novo* resentencing in this case would be to knowingly turn a blind eye to the §3553(a) factors and especially to the fundamental overriding principle that the sentence imposed must be sufficient, but no greater than necessary to satisfy the purposes of sentencing, based on all relevant factors that apply today, as Mr. Orena now stands before the Court. *See* 18 U.S.C. §3553(a).

Failing to conduct a *de novo* sentencing would mean knowingly ignoring material

---

[3] In *Tellier v. United States*, 2023 U.S. App. LEXIS 12792, *4, 2023 WL 36008394 (2d Cir. May 24, 2023), the Court explained that for these purposes an example of a resentencing that would be "simply ministerial" or an "empty formality" is "when one or more of the sentences carry mandatory minimum sentences of life imprisonment...." In that circumstance, the Court wrote, "... a district court does not abuse its discretion by declining to conduct a *de novo* resentencing on the counts that are not vacated." *Id*. That certainly is not the case here.

[4] *See e.g., United States v. Birkett*, 2023 U.S. Dist. LEXIS 112714, *18-*19 (E.D.N.Y., June 29, 2023) (noting the significance of the Guidelines status as advisory and not mandatory after *United States v. Booker*, 543 U.S. 220 (2005); under the mandatory Guidelines system, the inability to consider all attending circumstances into account was in conflict with the command under 18 U.S.C. §3553(a) to consider whether the punishment of life imprisonment was "no greater than necessary" to satisfy the purposes of sentencing or created a disparity among defendants with similar records who committed similar conduct.); *United States v. Russo*, 2022 U.S. Dist. LEXIS 213643, *17-*18, 2022 WL 17247005 (E.D.N.Y., November 28, 2022) (noting impact of non-mandatory status of Guidelines and sentencing disparities in reducing Mr. Orena's co-defendant's sentence, notwithstanding his life sentence and alleged leadership role in the Colombo family and in orchestrating at least two murders). *See also, United States v. Monteleone*, 2023 U.S. Dist. LEXIS 62518, 2023 WL 2857559 (E.D.N.Y., April 10, 2023) (reducing Mr. Orena's co-defendant's sentence of multiple life imprisonment terms for multiple murders to time served, noting mandatory nature of Guidelines at the time of the original sentencing and sentencing disparities; noting Anthony Russo's leadership role in the Colombo family).

sentencing factors under §3553(a) and other fundamental sentencing principles, including the indisputable evidence of Mr. Orena's rehabilitation, model inmate behavior for during the more than 30 years he has served, his service to others and personal religious development, and the combination of all of these factors. *see Pepper v. United States*, 562 U.S. 476, 491 (2011); *Russo*, 2022 U.S. Dist. LEXIS 213643 at *22. It would also mean ignoring all of the factors establishing beyond dispute that Mr. Orena poses not threat of recidivism or any danger to anyone. This includes a determination by the Bureau of Prisons that he presents the lowest possible risk and his disabling, terminal medical issues that, as has been fully demonstrated, have left him today suffering from multiple terminal, deteriorating physical and mental health issues, entirely unable to self care, confined to a wheelchair, and suffering from dementia, such that he does not know who or where he is, according to prison officials. Mr. Orena stands before the Court today on the eve of his 89th birthday a very different man for all purposes relevant to sentencing.

Additionally, the sentences imposed on most of the counts of conviction have been more than fully served. As noted in Mr. Orena's Objections to the "updated" PSR, the government and the Probation Department clearly are working from two different versions of the indictment as the operative document in this case [See ECF# 1924 at 3, n.4; ECF# 1925 at 2-3, N.1]. If the Court credits the indictment described in the government's June 26, 2023 letter, then of the 8 remaining counts of conviction, after Count 8 is vacated, Mr. Orena has already more than completed the sentences imposed on 5 of the 8 remaining counts.

Again, of the remaining counts, while a life sentence was imposed, none was a mandatory life sentence and each was imposed based on a mandatory Guidelines system which no longer is mandatory.[5] Failing to provide a *de novo* resentencing also would mean knowingly ignoring the significant sentencing disparities among co-defendants and based on the crimes of conviction, described at length in decisions in Mr. Orena's co-defendants cases ordering their release. See *Russo*, 2022 U.S. Dist. LEXIS 213643 at *17-*23; *Monteleone*, 2023 U.S. Dist. LEXIS 62518 at *15-*18.

**The Government's Continuing Failure to Take Accountability for Fully Discredited Findings at the Original Sentencing and in Proceedings that Followed and to Insist that this Court Rely on Them in Rejecting a *De Novo* Resentencing Must be Rejected.**

As judges in this District continue to note, the original sentencing of this group of defendants was based on information then known to the Court which has been materially undermined by evidence uncovered since, much of which had been intentionally and unethically withheld by the government. *See e.g., United States v. Monteleone*, 2022 U.S. Dist. LEXIS 213643 at *10, n.6;[6] [See ECF# 1869, incorporated herein].

---

[5] *See Russo*, 2022 U.S. Dist. LEXIS 213634 at *16-*17.

[6] "The government did not disclose at trial that co-conspirator Gregory Scarpa, Sr., ... was an informant for the FBI working with Supervisory Special Agent Roy Lindley Devecchio.

In the government's June 26th letter, it argues against a resentencing based on the contention, once again, that this Court must credit the findings Judge Weinstein made at the time of the original sentencing to justify imposing a life sentence and it objects further because Judge Weinstein held hearings back in the 1990s and made findings. [ECF# 1926 at 4-5].

The government further seeks to exploit its own unprecedented and well documented and reported outrageous misconduct by erroneously asserting that Judge Weinstein earlier considered and rejected it when, in truth, the actual details about the extent and breadth and the government misconduct in this case did not even surface until after the decision by Judge Weinstein to which the government refers at Page 5 of its June 26th letter [ECF# 1926]. Moreover, the arguments that the government notes Judge Weinstein found "unpersuasive" and requiring "crossing the line from rationality to paranoia" have since, of course, been found by multiple judges, independent investigations, and by the DOJ itself, to be not just "rational" but absolutely true and an understatement of the actual misconduct that occurred. [See *infra*. at note 6 and below].[7]

---

Despite committing many of the murders that occurred as part of the Colombo Crime Family War, Scarpa was not indicted. DeVecchio was later unsuccessfully charged with murder for his role in allegedly assisting Scarpa in four killings." *Id*. (Block, J.).

In 1997, Chief Judge Sifton wrote a lengthy decision laying out the outrageous details of the corrupt relationship between Scarpa and the FBI that had been withheld by the government. What Chief Judge Sifton knew then only scratched the surface of the breadth and depth of that corruption and the crimes Scarpa and Devecchio committed. *United States v. Persico*, 1997 U.S. Dist. LEXIS 23290, 1997 WL 867788 (E.D.N.Y., March 13, 1997). The Second Circuit reversed Chief Judge Sifton's decision setting aside the convictions because of the misconduct, finding that the misconduct did not meet the standard for setting aside the convictions; but his factfinding was not undercut. *United States v. Orena*, 145 F.3d 551 (2d Cir. 1998). Those findings included not just that the government concealed Scarpa's informant status from the defendants, but that Scarpa falsely attributed to others several murders with which he was involved. *See United States v. Monteleone*, 2023 U.S. Dist LEXIS 62518 at *4 (E.D.N.Y., April 10, 2023).

*See also,* November 20, 2012 Hearing Transcript in *Scarpa v. United States*, 02-cv-3953 (ERK) at 6: Judge Korman: "And it was my view and remains my view that Lin Devecchio provided information to Scarpa that got people killed ... I found it pretty outrageous and the bottom line was, of course, nothing happened to Lin Devecchio ...." "People outside of government are basically shocked when I tell them this is basically the story ...."

[7] The government offhandedly dismisses the indictment of the lead FBI agent on this case for multiple murders, by noting that the case was dismissed during the trial. [ECF# 1926 at 5, n.2]. Apart from being a completely inappropriate position for the government to take on such an extraordinary development as the murder indictment of an FBI agent, the government's treatment of the matter ignores the findings by the trial judge who presided over that murder trial

9

The government complains further that Mr. Orena seeks the resentencing "essentially" to challenge his conviction. [ECF# 1926 at 5]. It is, of course, true that information the government knowingly withheld and that Mr. Orena only obtained through happenstance directly undermines the integrity of his conviction (e.g., the TECI Sparaco interview described below); but the arguments he intends to make at the *de novo* resentencing go directly to relevant sentencing issues. Among other things, Judge Weinstein relied on uncharged and unproven conduct to justify the life sentences he imposed. Overwhelming evidence uncovered since that original sentencing over 30 years ago has surfaced that directly undermines those findings as to uncharged and unproven "relevant conduct." This is evidence this Court found it had no authority to consider in the context of Mr. Orena's compassionate release motion. It would be a grave injustice to Mr. Orena and his family, and to the integrity of the sentencing process and the principles reflected in 18 U.S.C. §3553(a) to ignore this evidence now, when the Court has full authority and the opportunity to conduct a *de novo* resentencing of Mr. Orena as he now stands before the Court.

Because the government has raised this issue once again and has done so in a manner that minimizes or entirely misrepresents the outrageous conduct at issue and that asks the Court yet again to ignore such conduct that is directly relevant to the original sentence and to the compelling justification supporting a *de novo* resentencing, I will set out here again the indisputable evidence on the subject that was previously provided to the Court [ECF# 1869], but which the Court concluded it lacked the authority to consider in that context. The Court surely has the authority and, we respectfully submit, the obligation to consider here.

**Response to the Government's Continued Reliance on Discredited Sentencing Findings**

Since the time of Mr. Orena's conviction, the prosecution of the so-called Colombo War cases has been exposed as the single most corrupt prosecution in the history of our criminal justice system. Court opinions, articles, books, and documentaries have been written and made about the corruption and ethical violations that marked the prosecution in this case and all related cases.[8] In 2005, the FBI cited the corrupt relationship in this case in its report on guidelines for

---

and all subsequent developments, including Devecchio's own admissions about his outrageous misconduct. [See below and ECF# 1869].

[8]

https://www.newyorker.com/magazine/1996/12/16/the-g-man-and-the-hit-man?irclickid=wJ4VA11VpxyORwmwUx0Mo38QUkBWXDzxQyJWRU0&irgwc=1&source=affiliate_impactpmx_12f6tote_desktop_Bing%20Rebates%20by%20Microsoft&utm_source=impact-affiliate&utm_medium=2003851&utm_campaign=impact&utm_content=Logo&utm_brand=tny

https://nypost.com/2007/01/14/gangland-g-man-sent-rat-into-trap/

Peter Lance, *Deal With the Devil, The FBI's Secret Thirty-Year Relationship with a Mafia Killer*

interacting with cooperating witnesses as a result of what went on between the lead FBI agent Devecchio and notorious mob hit man Gregory Scarpa, that included literally giving their vicious, murdering, source of information, Scarpa, license to kill. https://oig.justice.gov/sites/default/files/archive/special/0509/chapter3.htm  (See especially Section III. D. and Case Study 2).

The lead FBI agent, Devecchio, was indicted for multiple murders directly related to these cases.  Devecchio was exposed as having picked sides and he celebrated murders, while providing information to Scarpa in order to facilitate the murders.  And the prosecution was a part of it all, knowingly withholding evidence of the corrupt relationship between Devecchio and Scarpa in what then Chief Judge Sifton characterized as a "reprehensible" and "myopic withholding of evidence" (referring specifically to then AUSA Andrew Weissmann's conduct).[9]"  At the time Judge Sifton made that finding, the revelations of corruption had not even scratched the surface of what actually transpired.

Tellingly, following the disclosure of the corruption evidence, and the decision by Judge Korman that such evidence was relevant for a jury to hear, well after Mr. Orena's conviction in the instant case, defendant after defendant in the so-called Colombo war prosecutions was acquitted, including Mr. Orena's own sons. *See United States v. Orena et al.*, 93 cr 1366 (ERK); *see also* [ECF# 1869-1].  Indeed, 4 different juries acquitted all defendants in the Colombo cases in which the jury learned about the corruption that was concealed from the jury in Mr. Orena's case.  Just a few years ago, Judge Korman finally openly expressed the obvious in no uncertain terms - FBI agent Devecchio clearly was providing information to Scarpa to facilitate the murders he was committing. https://www.nydailynews.com/new-york/nyc-crime/brooklyn-judge-fbi-agent-aided-mob-hits-article-1.2488378

---

(Morrow 2013).

https://www.nytimes.com/2006/03/30/nyregion/exfbi-agent-accused-of-role-in-four-organized-crime-killings.html

http://www.usa-the-republic.com/items%20of%20interest/Win_At_All_Cost/Switching_sides.htm

[9]  See *United States v. Theodore Persico, Jr. et al.*, CR-92-0351 (CPS), Memorandum and Order of February 18, 1997.  In Chief Judge Sifton's original decision, he singled out AUSA Andrew Weissmann for his particularly unethical behavior.  Then U.S. Attorney Zachary Carter wrote to the Chief Judge, asking him to remove Weissmann's name.  Chief Judge Sifton complied and the final reported version omits Weissmann's name.  I have copies of the original, the letter, and, of course, the final decision and can provide them at the Court's request.

In response to the government's minimization of the Devecchio indictment, consider as well the following excerpt from the presiding judge's 2007 decision in *People v. Devecchio*, 2007 N.Y. Misc. LEXIS 7827, *4-*4 (Kings Co. Sup. Ct., Nov. 1, 2007):

"It is certainly true that through the years, Greg Scarpa provided valuable and, in some instances, unique information on the workings and structure of the organized crime families in New York and the Columbo family in particular. Interestingly, and perhaps inexplicably, Scarpa provided information not only on others, but also on his own son, Greg Scarpa Jr., and, indeed, on himself as well. Scarpa readily admitted to his own involvement in loan-sharking, gambling and bank burglaries. He informed on rivals and those closest to him, including members of his own crew. And in keeping with his treacherous nature, he also provided information to the FBI that was purposely deceptive and untrue in an attempt to point the finger of accusation away from his own misdeeds and on to that of gang rivals. He provided information on the murder of Joe "Brewster" DeDomenico and the attempt to kill Joe "Waverly" Cacace without indicating that he himself was involved in both. Similarly, he blamed on others the murder of Nicky "Black" Grancio that he had committed. On the limited evidentiary record provided to the Court, it is impossible to determine how much of Scarpa's information was accurate and valuable and how much was not.

What is undeniable was that in the face of the obvious menace posed by organized crime, the FBI was willing, despite its own formal regulations to the contrary, to make their own deal with the devil. They gave Scarpa virtual criminal immunity for close to 15 years in return for the information, true and false, he willingly supplied. Indeed, this Court is forced to conclude that Scarpa's own acknowledgment of criminal activity to the FBI could only be explained by his belief that the agency would protect him from the consequences of his own criminality, which the record suggests is what they did.

Not only did the FBI shield Scarpa from prosecution for his own crimes, they also actively recruited him to participate in crimes under their direction. That a thug like Scarpa would be employed by the federal government to beat witnesses and threaten them at gunpoint to obtain information regarding the deaths of civil rights workers in the south in the early 1960s is a shocking demonstration of the government's unacceptable willingness to employ criminality to fight crime. It is redolent of the current mindset of some in the government who argue that the practice of terror and torture can be freely employed against those the government claims are terrorists themselves: that it is permissible to make men scream in the name of national security. These are shortcuts that devalue legitimate polite work, their yield is insignificant and the cost to the fundamental values they debase is enormous."

Devecchio has now openly admitted knowing full well that Scarpa was committing murders while on the street acting as his informant.
https://www.youtube.com/watch?app=desktop&v=btQkfCyd6Lw[10]

*See also*, [ECF# 1869-2 - Report of the Special District Attorney In the Matter of the Investigation of Linda Schiro by Judge (ret.) Leslie Crocker Snyder.

In his testimony at an evidentiary hearing in Mr. Orena's case, Devecchio lied and adamantly denied this. Of course, he still has not admitted his own direct role in multiple murders which went far beyond just facilitating them by providing information. Devecchio's far more directly involved roles have been described to me in detail by Gregory Scarpa, Jr., even at the cost of putting himself into the murders for which he never was even a suspect.

ECF# 1869-3, incorporated herein, is the Brooklyn District Attorney's submission to the Kings County Supreme Court, pursuant to *People v. Molineux*, 168 N.Y. 264 (1901), describing just some of Devecchio's conduct in relation to murders and other illegal activity during the so-called Colombo War. This is all information that was withheld from Mr. Orena and the jury that heard his case.

All of this evidence and much more was withheld from Mr. Orena in his prosecution and and it completely undercuts the integrity of the conviction and the sentence imposed. It is inconceivable how, in fairness, the government could have failed even to make reference to this unprecedented corruption when asking the Court to rely on the conviction and sentence in denying Mr. Orena's compassionate release.

**The Corruption Undermining the Integrity of the Conviction and Sentence Went Further**

The corruption and illegal/unethical withholding of evidence did not just stop with the concealment of the Devecchio/Scarpa relationship that was driving the war and that was responsible for most of the murders that occurred.

More recently, we have learned of additional misconduct that directly and completely undermines the integrity of the charge that Mr. Orena killed Thomas Ocera - a crime the government relies heavily on in its opposition. Mr. Orena has vehemently denied his involvement in this crime at all times. We now know that the prosecution had strong reason to believe Mr. Orena was not at all involved in the Ocera murder and did not even know how, why, or by whom Mr. Ocera was killed. I will explain.

---

[10] This Devecchio interview with 60 Minutes' Anderson Cooper should be viewed in its entirety; but the Court could focus its attention particularly to timer marks approximately 4:15 and 5:20 to hear Devecchio acknowledge that he knew Scarpa was committing murders and that he would not make an arrest or pursue a case in which Scarpa committed the murder.

One of the government's Top Echelon Confidential Informants, Frank Sparaco, an admitted organized crime member, has come forward and has revealed to Mr. Orena that while working for the government on the Colombo prosecutions, he regularly was encouraged to lie and his lies were knowingly facilitated by the government. Sparaco also was given free rein by the government to commit murders, including murders charged as so-called Colombo War murders.

As an example of the government's unlawful agenda and willingness to bring false charges, Sparaco advised that he admitted to the murder of a man named Michael Bowcock and provided the government with all details and his motive; yet a decision was made to charge one of Mr. Orena's co-defendants, Michael Sessa, with that murder, even though the government well knew he had nothing to do with it. The charge eventually was dismissed; but the misconduct was outrageous.

Perhaps the most directly relevant revelation by Sparaco with respect to the integrity of the conviction and the sentence imposed for it related to the Ocera murder and it was supported by an exculpatory report of investigation he provided, which at all times had been withheld by the government. As reflected in the report of investigation, memorializing an interview with Sparaco on "12/4/89," Sparaco told the government in no uncertain terms well before Mr. Orena's trial for the Ocera murder, that John Gotti, not Mr. Orena, had "authorized the OCERA 'hit'" and that it was "without permission of the hierarchy of the COLOMBO LCN family" (which was alleged to include Mr. Orena). Sparaco explained to the government the reason Gotti had Ocera killed (having nothing to do with Mr. Orena) and he further advised that the Colombo family was actually "very uneasy" about the murder.[11] [ECF# 1869-4]

With respect to sentencing, the government has repeatedly asked the Court to rely on the findings made in the original PSR and by Judge Weinstein. This includes the most inflammatory (and totally unsupported) claim that Mr. Orena was somehow responsible for the killing of 12 people in the Colombo War and that this supports life sentences for him. [ECF# 1865 at 2]. However, we now know that, according to TECI Frank Sparaco (memorialized in a letter he wrote), the FBI knew full well that he (Sparaco) and Scarpa were committing murders while acting as informants and, in fact, Devecchio put them on the street specifically to kill so that the Persico faction would have complete control of the Colombo family. Sparaco specifically wrote that he and Scarpa killed 12 people on that agenda. The government (one of the prosecutors on the instant case) reportedly was forced to disclose what it knew about three Colombo War murders Sparaco committed in 2011.
https://www.nydailynews.com/news/crime/colombo-crime-fam-hit-man-frankie-blue-eyes-sparaco-lied-killed-fbi-informant-article-1.956248

---

[11] The source of information for this report is redacted on the document; but Sparaco himself provided the document to a defense investigator and identified himself as the source. Of course, the source is less important than the fact that this directly material exculpatory document was withheld by the government on the very charge the government now emphasizes should be used to deny Mr. Orena's compassionate release.

14

There are many more relevant facts that have been discovered in recent years that further undermine the integrity of Mr. Orena's conviction and sentence and, indeed, the government's whole theory of prosecution. As mentioned above, defendant after defendant who faced trial in this District for a role in the so-called Colombo War cases was acquitted once his jury learned about the corruption that marked these prosecutions. There is every reason to believe that would have been the case for Mr. Orena as well, had this evidence not been withheld and in some instances directly lied about by the government and its witnesses.

### The Matter of Mr. Orena's Competency for Resentencing

In its June 26th letter at Page 5, the government appears to argue that if the Court decides to go forward with the *de novo* resentencing as has been contemplated by all at all times, it "may require additional fact-finding into Orena's competency." [ECF# 1926 at 5]. This assertion is both cruel and ironic. In arguing against Mr. Orena's compassionate release, notwithstanding the abundantly documented evidence from the BOP's own records that Mr. Orena suffers from advanced dementia and does not know who he is from day to day - believing he is the President of the United States, the prison warden, or a general in the army, government counsel asserted, nevertheless, that he posed a danger to the community if released because he could engage his old organized crime connections and somehow convince them to commit criminal acts. [October 13, 2021 Hearing Tr. At 38]. Now, when it suits it current agenda, the government has reversed course and argues that Mr. Orena's mental faculties are such that his competency might not permit a resentencing. I will be prepared to address this at the status conference.

Respectfully,

/s/ David I. Schoen
Counsel for Victor J. Orena

cc: AUSA Devon Lash, Esq. (Via ECF)

15