| | | |
|---|---|---|
| 1 | | UNITED STATES DISTRICT COURT |
| 2 | | EASTERN DISTRICT OF NEW YORK (BROOKLYN) |

| | |
|---|---|
| 3  UNITED STATES OF AMERICA, | |
| | Case No. 1:92-cr-00351-EK-1 |
| 4        Plaintiff, | |
| 5  v. | Brooklyn, New York |
| | July 6, 2023 |
| 6  VICTOR J. ORENA, a/k/a Victor | 10:27 a.m. |
| J. Orena, a/k/a "Little Vic", | |
| 7 | |
| 8        Defendant. | |

9                       TRANSCRIPT OF HEARING
                  BEFORE THE HONORABLE ERIC R. KOMITEE
10                   UNITED STATES DISTRICT COURT JUDGE

11  APPEARANCES:
    For the Plaintiff:          Devon Lash, Esq.
12                              U.S. Attorney's Office
                                271-A Cadman Plaza East
13                              Brooklyn, NY 11201

14  For the Defendant:          David Schoen, Esq.
                                Attorney at Law
15                              2800 Zelda Road
                                Suite 100-6
16                              Montgomery, AL 36106

17  Also Appearing:             Jeremy Toner, Probation

18  Clerk:                      Unknown

19  Court Recorder:             Electronic Sound Recording

20  Transcription Service:      Chris Hwang
                                Abba Reporting
21                              PO Box 223282
                                Chantilly, Virginia  20153
22                              (518) 302-6772

23

24  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

25

1          (Call to order at 10:27 a.m.)

2          THE CLERK:  Criminal cause for a status conference,

3     the United States of America v. Victor Orena, docket number 92-

4     CR-351.

5          Would you all please state your appearances for the

6     record, starting with the Government?

7          MS. LASH:  Good morning, Your Honor, Devon Lash on

8     behalf of the United States.

9          MR. TONER:  Good morning, Your Honor, Jeremy Toner on

10    behalf of the Probation Department.

11         MR. SCHOEN:  David Schoen, Your Honor. on behalf of

12    Victor Orena.

13         THE COURT:  Good morning, everyone.  Okay, so we had

14    this case on for re-sentencing today.  We put it on for

15    re-sentencing at a time when the parties appeared to agree that

16    the applicable cases require re-sentencing.

17         Since then, a couple of things at least have

18    happened.  Number one, the Government wrote to express a

19    position that given the 2nd Circuit's Pena, P-E-N-A decision

20    earlier this year, at least it became final earlier this year,

21    re-sentencing is not technically required.

22         Two, I got word from Defense counsel that you believe

23    the Pre-Sentence Report that had been prepared was inadequate

24    for a number of reasons.

25         I put the question to Defense counsel do you want to

1    -- and this was before I knew that the Government had revised

2    its position on re-sentencing necessity.  I put the question to

3    Defense counsel, do you want to proceed to re-sentencing on the

4    PSR we have or do you want the PSR to be further updated?

5         And I understand Defense counsel's position to

6    believe that they think a more fully revised Pre-sentence

7    Report is in order.

8         So we're here today to talk about whether re-

9    sentencing is indeed necessary or appropriate here.  We are

10   also here to decide what that re-sentencing proceeding would

11   entail if we go that route.

12        Do we have -- well, what would the agenda be?  The

13   Defense has raised a lot of legal and factual arguments about

14   improprieties that you've identified in your view in connection

15   with the Defendant's original trial, newly discovered evidence

16   that you say is important that you became aware of thereafter

17   and the like.  How much of that would be appropriately taken

18   into account at a re-sentencing proceeding as opposed to in

19   some other context?

20        And if we do go the re-sentencing route, what would

21   the timing of that proceeding look like?  I understand we have

22   some time pressure here perhaps in Defense view given the

23   Defendant's advancing age and decline in health.

24        Nevertheless, I feel like that I'm the one pushing

25   this case forward more so than any of the parties for reasons

1     that at times have felt mysterious to me.

2          So let me begin with Defense counsel today.  What is

3     it that you are seeking by way of re-sentencing?  Do you

4     believe that re-sentencing is legally required either because

5     it's mandatory under the law or because it would be an abuse of

6     my discretion in this case not to conduct a full re-sentencing

7     hearing and why?  And most importantly, what would that

8     re-sentencing proceeding entail?

9          MR. SCHOEN:  Thank you, Your Honor.  Judge, just one

10    point that I wanted to make on the timing issue.  It certainly

11    had been my intention to move things forward as quickly as

12    possible.  That's why, as the Court might recall, I said that I

13    wanted to proceed with a compassionate release first.  I

14    thought that we would be successful with that, frankly, and

15    that would be the most efficacious course to get this thing

16    resolved.

17         It didn't work out that way.  And so, that appeal

18    dragged on for quite a while and so on, but it certainly had

19    been my intention to move things along.

20         However, with respect specifically to the sentencing,

21    I do think we're better served to have a fully updated Pre-

22    sentence Report.

23         And so, I think that does affect the timing of my

24    position that we're entitled to re-sentencing.  Now the

25    specific questions the Court asked, the requirement.

1          THE COURT:  What would the process of putting

2     together the revised PSR that you're contemplating entail?

3          MR. SCHOEN:  Well, some of it is --

4          THE COURT:  Are you asking for the Probation

5     Department to interview your client again?

6          MR. SCHOEN:  Yeah, I mean, I responded to that in

7     the -- my letter that I wrote to the Court.  I think that what

8     would be most appropriate -- the Court might recall the Court

9     directing me to file an answer to certain questions the Court

10     answered and that was one of them.

11          What I suggested was at least the family be

12     interviewed, but I think that the most basic things were some

13     of the things I identified early on in the objections.

14          In other words, in my view at least, when a person, a

15     Defendant comes before the Court, they come before the Court as

16     they stand before the Court at that point in time.

17          The Pre-sentence Report that we received, the updated

18     report, showed Mr. Avena (phonetic) -- Mr. Orena as a 58 year

19     old man, who had certain bank accounts and all -- so I think

20     those basic pedigree information, that basic pedigree

21     information certainly has to be updated otherwise the Court

22     doesn't have anywhere near the picture of the person who stands

23     before the Court at the time of sentencing, but it also should

24     reflect that five out of the eight counts of conviction have

25     been served fully already.

1          THE COURT:  What -- you mentioned that you thought it

2     appropriate for family members to be interviewed.  Have you

3     stated which family members?

4          MR. SCHOEN:  I think I said his son in the letter

5     that I wrote.

6          THE COURT:  Okay.

7          MR. SCHOEN:  I may be wrong, but his son is the most

8     in touch with Mr. Orena.  They certainly can, you know,

9     interview Mr. Orena.

10         I assume perhaps at the end of this, I don't know how

11    the Court intends to proceed, but the end of this, we may be

12    discussing the Government's position also that there ought to

13    be a competency evaluation if there is a re-sentencing.

14         THE COURT:  Right.

15         MR. SCHOEN:  So I can address that in terms of who

16    should be interviewed.  Also, I had a recent conversation with

17    Mr. Orena that might be helpful to illuminate that issue a

18    little bit, but if the Court wants me to go back to the

19    original question --

20         THE COURT:  Well, just one issue at a time.

21         MR. SCHOEN:  Okay.

22         THE COURT:  So can we just spell out for Probation to

23    the extent you think revisions to the PSR are necessary, those

24    consist of what?  We're going to update obviously all

25    biographical information like age.

1              MR. SCHOEN:  Right.

2              THE COURT:  You're talking about an interview of his

3      son.  Does he have more than one son, only one son, is it clear

4      to Probation who this is?

5              MR. SCHOEN:  He has a couple of sons.  His son is

6      Andrew, but I'm happy to provide Probation with the letter that

7      I wrote to the Court also or speak to Probation about it, Your

8      Honor.  I'm just trying to pull the letter, so that I make sure

9      I cover everything that I said.

10             First of all, the objections that I filed on June

11     7th, ECF 1924, deals with it to some degree, but the letter of

12     June 23rd, 2023, ECF 1925, which I can provide to Probation as

13     well, tried to address the Court's direction to me to answer

14     the questions the Court is asking now.

15             THE COURT:  What does that letter say precisely about

16     who you want interviewed?

17             MR. SCHOEN:  About who I want interviewed, right?

18     Here's what I say.  Into my experience, the Defendant and often

19     his family are interviewed as a matter of course in preparing a

20     PSR, both for the Probation officer to get the answers to

21     relevant questions for the PSR --

22             THE COURT:  Let me just ask a direct question.  I

23     don't want you to read your letter.

24             MR. SCHOEN:  Andrew Orena.

25             THE COURT:  Does --

1    MR. SCHOEN:  Mr. Orena's son, Andrew Orena, should be

2  interviewed at least --

3    THE COURT:  Okay.

4    MR. SCHOEN:  -- I write in here.

5    THE COURT:  Have you provided his contact information

6  to the Probation Department?

7    MR. SCHOEN:  No, I haven't.

8    THE COURT:  Does it make sense to do that?

9    MR. SCHOEN:  Sure, it does.

10    THE COURT:  Okay.  Yeah, I will say -- I mean, this

11  is an aside of sorts, but the letter you sent me yesterday was

12  15 single-spaced pages.

13    MR. SCHOEN:  Yeah.

14    THE COURT:  And it goes on at some length on matters

15  that I view as at best tangential to what we're doing here and

16  at worst literally irrelevant.

17    For example, on page 5, multiple paragraphs about

18  your conversations with a case manager at FMC Devens about how

19  to set up a video call and it's difficult to have the video

20  call, so then you have a phone call.

21    Like I don't need you to apprise me of every

22  intermediate step along the way because it creates a very

23  substantial risk that important facts and law will get lost in

24  the mix, but as I say, that's a tangent.  Okay.

25    MR. SCHOEN:  Your Honor, may I respond as to why I

1    provided that detailed information, Your Honor?

2              THE COURT:  Sure.

3              MR. SCHOEN:  Because the Government changed the

4    position on June 26th from the position it had taken for two

5    years.

6              I thought it was important for the Court to know all

7    of the communications I've had with the Government up to that

8    date, which the Government never once mentioned taking a

9    position that it would now say that there shouldn't be a

10   re-sentencing in the case.

11             THE COURT:  What does that have to do with the case

12   managers?

13             MR. SCHOEN:  I'm telling the Court the chronology

14   here that the Government set up a call for me.  I had

15   communication with the Government during that period.  The

16   Government set up a call for me with the prison about bringing

17   Mr. Orena in.  That assumed a re-sentencing hearing as recently

18   as, you know, June and June 15th and --

19             THE COURT:  Okay.  Yeah, we'll get to the question of

20   reliance.  Okay, why is re-sentencing -- well, is re-sentencing

21   legally required here in your view?

22             MR. SCHOEN:  In my view, it's legally required.  To

23   give a brief overview, Pena -- before Pena, everyone agreed

24   when a count of conviction is overturned, full *de novo*

25   re-sentencing is required.  That's Powers (phonetic), Rigas

1    (phonetic), and these other --

2              THE COURT:  Well, Judge Cogan didn't agree with that,

3    right?

4              MR. SCHOEN:  Under direct appeal.

5              THE COURT:  Under direct appeal, okay.

6              MR. SCHOEN:  Yes, I'm saying the background is.

7    Before that, before Pena, everyone agreed that a full *de novo*

8    re-sentencing was required.

9              Pena said that on a -- when it's a successive 2255

10   that leads to the vacating of a count of conviction, re -- full

11   *de novo* re-sentencing is not always mandatory.  It said that

12   there are limited -- it's up to the Court's discretion and it

13   looks to 2255(b) for what the remedies could be.  I lay them

14   out in my letter, four remedies.

15             But the mandatory *de novo* re-sentencing, it was no

16   longer mandatory subject to the Court's discretion.

17             However, the Court wrote in the Pena opinion that

18   there are limits to this discretion.  And in most cases in

19   which a re-sentencing would not be "strictly ministerial", it

20   may be an abuse of discretion to not re-sentence.

21             In Pena, of course, it was strictly ministerial

22   because there were mandatory life sentences in the case.  And

23   the same thing with the Tellier, T-E-L-L-I-E-R case that the

24   Government cites.

25             THE COURT:  What about Medun Janin, Judge Cogan's

1   case cited in Pena?  Was that a strictly ministerial

2   re-sentencing?

3           MR. SCHOEN:  I'm not sure, Judge.  I don't know the

4   answer to that.

5           THE COURT:  I think the answer was it wasn't.  I

6   understand your view and I do think you're right to invoke that

7   sentence in the last paragraph before the conclusion in Pena

8   that suggests that they say it may be, it may be that in most

9   cases in which re-sentencing would not be strictly ministerial,

10  a district court abuses its discretion when it denies *de novo*

11  re-sentencing.

12          But we do not -- we need not and do not attempt today

13  to define the circumstances under which a district court abuses

14  its discretion in denying *de novo* re-sentencing.

15          All they say there is you don't need *de novo*

16  re-sentencing when the exercise would be an empty formality as

17  it was in Pena.

18          MR. SCHOEN:  And Tellier.  And the two examples we

19  have from the 2nd Circuit are Pena and Tellier.

20          THE COURT:  Right.

21          MR. SCHOEN:  And both of those cases, what they use

22  to describe as I set out in my letter strictly ministerial at

23  least in Tellier, the example they give is their mandatory life

24  sentences.  Doesn't mean that's an exclusive example, I

25  understand.  That's an example they give.

1       THE COURT:  I don't think -- so I'm looking at page 9

2    of Judge Cogan's Medun Janin opinion, M-E-D-U-N J-A-N-I-N.

3    There, the contemplated re-sentencing proceeding involved a

4    defendant who had been sentenced to 65 years in custody on a

5    series of underlying crimes, each such 65-year sentence to run

6    concurrently to one another, 30 years custody to run

7    consecutively on a 924(c) count that survived, and life to run

8    consecutively on Count 11.

9       And I understand the count that been vacated there I

10   think was Count 11.  No, Count 11 remained valid.  Sorry, Count

11   9, which was the 30-year consecutive provision was invalidated,

12   but life to run consecutively on Count 11.

13      But the life sentence on Count 11 was not mandatory.

14   I think if I'm reading this opinion correctly, that the

15   mandatory minimum on Count 11 was a 30-year consecutive

16   sentence because the offense involved the use of a destructive

17   device.

18      So you've got a 30-year minimum there, plus 65 years

19   of discretionary sentencing to run consecutive.  And yes, and

20   Judge Cogan says in practice, there is no difference between 95

21   years custody on the one hand and life plus 95 years custody on

22   the other hand.

23      But in either case, I think he's taking sentences

24   that are not mandatory into account when he compares the one

25   hand to the other hand.

 1              And there must be cases either in the district courts

 2      of this circuit or in other circuits that answer that question,

 3      right?

 4              Pena answered the question re-sentencing is not

 5      mandatory when it would be a purely ministerial act, an empty

 6      gesture, whatever they said.

 7              It did not answer the question of when a district

 8      court otherwise abuses its discretion to deny de novo re-

 9      sentencing.

10              MR. SCHOEN:  Judge, I don't think there is any

11      perfect answer to it.  I think the Court in Pena and Tellier

12      make that clear.  And those are the most recent decisions from

13      the 2nd Circuit.

14              The case the Court's referring to of course as the

15      Court noted is cited in Pena and pre-dates it by, you know,

16      some two years.

17              THE COURT:  Oh.

18              MR. SCHOEN:  That would answer the -- the fact that

19      Judge Cogan may have handled it the way -- re-sentencing in a

20      certain way before Pena I don't think answers the question as

21      to what the 2nd Circuit meant in Pena.  I don't think there's

22      any perfect answer.

23              THE COURT:  We're reading tea leaves here, I agree.

24      The 2nd Circuit did cite the Cogan opinion and a Kaplan opinion

25      from the Southern District with what looked like at least mild

1    approval to my eye in <u>Pena</u>.

2              But let's assume we're in -- you know, we're in the

3    world of discretion and all of us are united in our interest

4    not to abuse that discretion.  What would the re-sentencing

5    proceeding consist of?

6              And specifically, if you could start with what

7    overlap would there between a re-sentencing proceeding and the

8    2255 motion about newly discovered evidence?

9              MR. SCHOEN:  Yeah.

10             THE COURT:  Which I don't think is briefed yet.  Is

11   that correct?  Like your second grounds for relief under

12   Section 2255 remains to be briefed, correct?

13             MR. SCHOEN:  Correct.

14             THE COURT:  Okay, so are we taking up these new

15   evidence questions at a re-sentencing?  And if so, why is that

16   appropriate?

17             MR. SCHOEN:  Here's why it's appropriate and directly

18   relevant, Your Honor.  And we see again in the Government's

19   letter of June 26th, they raised this DeVecchio issue.

20             The reason it's relevant is if the Court --

21             THE COURT:  You raised the DeVecchio issue.

22             MR. SCHOEN:  The DeVecchio issue is the decades of

23   writing about the misconduct, unprecedented misconduct an FBI

24   agent, lead agent in this case charged with four murders and

25   all of that business.  It's been written about extensively,

1    which the Government continues to minimize, as it continues to

2    minimize its role in --

3          THE COURT:  Nobody should minimize the seriousness of

4    the allegations concerning Agent DeVecchio's misconduct and the

5    credibility that some of -- that some district judges in this

6    building, among others, have ascribed to those allegations.

7          But Judge Weinstein held a hearing in 1997.  He wrote

8    an opinion, a very comprehensive opinion, in 1997 on the

9    subject and he said what he said.  What is the delta between

10   what Judge Weinstein knew at the time and what you say we know

11   now in addition?

12         MR. SCHOEN:  Well, about -- that was 1997.  2007,

13   DeVecchio's indicted for four murders, which goes well beyond

14   what Judge Weinstein referred to as paranoia.

15         He suggested in 1997 that it would be paranoia to

16   suggest that an FBI agent would actually leak information to a

17   -- to an informant.

18         THE COURT:  Where does he do that in his 1997

19   opinion?

20         MR. SCHOEN:  That's the gist of what he's talking

21   about with the paranoia.

22         THE COURT:  I don't think so.

23         MR. SCHOEN:  Okay.

24         THE COURT:  Is that right?  I mean, he --

25         MR. SCHOEN:  I was involved in those cases at the

1       time, Judge.  I'm pretty well aware of Judge Weinstein's view

2       of the thing.

3              He suggested it would be beyond the pale to suggest

4       that an FBI agent could be involved with actively facilitating

5       murders by an informant and that the idea that that could have

6       affected a conviction in the case would be beyond paranoia or

7       paranoia.  That's the gist of what Judge Weinstein --

8              THE COURT:  Was he not talking about the materiality

9       element though rather than the factual truth?

10             MR. SCHOEN:  I think in his paragraph where we uses

11      paranoia, he was talking primarily about the materiality, but

12      he suggested throughout the opinion that while there was bad

13      conduct that went on and it should have been disclosed, it was

14      nothing like what we know actually occurred in the case.  That

15      was beyond anything Judge Weinstein could have imagined based

16      on that opinion.

17             We know now from DeVecchio himself and from others

18      how far that went, including --

19             THE COURT:  So the main thing that Judge Weinstein

20      did not know in 1997, but that has subsequently come to light

21      is that Special Agent DeVecchio would be indicted by the

22      Brooklyn D.A.?

23             MR. SCHOEN:  A whole panoply of evidence regarding

24      DeVecchio.  And what he would not have known is that the

25      Government withheld a 302 in which a top echelon confidential

1    informant, Sporaco (phonetic), said that someone else committed

2    the murder that Mr. Orena was convicted of committing.

3          What he also wouldn't know is the Court focused in

4    denying a compassionate release on the Pre-sentence Report and

5    on some of Judge Weinstein's findings including that --

6          THE COURT:  But so aren't you asking for a

7    re-sentencing proceeding that is essentially going to assume

8    the invalidity of one or more of the underlying counts of

9    conviction?

10         MR. SCHOEN:  I think it's relevant.  The Sporaco

11   document for example is relevant to that as is the DeVecchio,

12   but in this context, it's relevant to the sentence imposed.  A

13   lingering doubt, lingering doubt is always relevant to

14   sentencing, but beyond that, let's not ignore that the Court

15   relied on relevant conduct.

16         And that relevant conduct for example that this Court

17   cited in its compassionate release decision was that somehow

18   Mr. Orena was responsible for 12 murders possibly because of

19   the war.

20         The evidence that's come out since is DeVecchio and

21   Scarpa fomented the war.  Sporaco has written a letter saying

22   he and Scarpa committed 12 murders during it, referring to the

23   war murders.

24         You know, I looked back at a decision from Judge

25   Block from 2009 in the Grancio case, G-R-A-N-C-I-O.  And in

1     that case, the Government's position was Mr. Grancio shouldn't

2     be able to sue DeVecchio, Favo, and the Government because it

3     was well known at the time how bad DeVecchio was.

4            And that for years, there had been articles that he,

5     for example, gave Scarpa information where Mr. Orena's

6     girlfriend was, so that he could kill Mr. Orena, those sorts of

7     things.

8            The reason it's relevant to sentencing, Your Honor,

9     is if the Court -- it depends on what the PSR looks like at the

10    end of the day.

11           If the Court intends to rely on relevant evidence,

12    I'm sorry on relevant conduct to get to a life sentence under

13    the advisory Guidelines, then yes, I think we have to be able

14    to rebut that evidence at a sentencing hearing.

15           If that's not going to be relevant evidence in the

16    case that the Court is relying on then we wouldn't --

17           THE COURT:  Sorry, which what evidence specifically?

18           MR. SCHOEN:  Well, it's a long decision that the

19    Court relied on from the original PSR and Judge Weinstein's

20    decision, but all of the facts in there about what Mr. --

21    relevant conduct that Mr. Orena was never convicted of at

22    trial, including some of the things I mentioned in the

23    objections that I filed.

24           But that's the only reason we -- that's the main

25    reason let's say we would need a Fatico hearing in the case,

1    Judge.  And that's been our position all along in this case

2    including as far back --

3              THE COURT:  Okay, and sorry.

4              MR. SCHOEN:  -- as November 14th of 2020 in a letter

5    --

6              THE COURT:  If --

7              MR. SCHOEN:  -- I wrote to the Court, 1853.

8              THE COURT:  I understand.  I just want a crystallize

9    this.  A Fatico hearing in which which factual issues would be

10   disputed?

11             MR. SCHOEN:  Depends on what the Pre-sentence Report

12   says, Judge.  Depends on what relevant conduct we're told the

13   Court may be relying on in this case at a sentencing

14   proceeding.

15             In that case, I would file a memo asking for a Fatico

16   hearing and identifying what the issues are that the Court

17   intended to rely on.

18             THE COURT:  Assume the PSR says everything that Judge

19   Weinstein's sentencing memorandum said.

20             MR. SCHOEN:  Everything in there that was uncharged

21   conduct, including Mr. Orena's role in this so-called war and

22   so on.

23             I think that the Court is going to rely on findings

24   that leave out the real facts of the war.  That is that

25   DeVecchio and Scarpa fomented it, that Scarpa was out there

1    killing people.  I think that to the extent that talks about --

2              THE COURT:  What does fomented mean?

3              MR. SCHOEN:  Promoting it.  He took an -- DeVecchio

4    took an interest in the war and in Scarpa.  He was getting paid

5    money by Scarpa.  He took Scarpa's side in the war.  He wanted

6    the Persico faction to win.  He wanted the Colombo family to

7    blow up --

8              THE COURT:  But you don't --

9              MR. SCHOEN:  -- by having people killed.

10             THE COURT:   -- like can I just try to in a very

11   common sense way cut the bottom line here?  Do you dispute that

12   there was a Colombo war and that there were two sides at least,

13   two sides shooting at each other irrespective, you know, we can

14   have a debate over who started it or who fomented it, but

15   you're not arguing that your client has a self-defense case to

16   make out here.

17             And so, where does that leave us on the big picture

18   of whether your client was on one side at least of a massively

19   murderous and destructive internecine war for control over an

20   organized crime family?

21             MR. SCHOEN:  The sentencing requires us to look at my

22   client's role in that.  It's nothing like what has been

23   presented --

24             THE COURT:  What is your client's role in that?

25             MR. SCHOEN:  At the time --

1    THE COURT:  What would the evidence show at a Fatico

2    hearing?

3         MR. SCHOEN:  The evidence --

4         THE COURT:  That your client's role was?

5         MR. SCHOEN:  That he didn't commit the murders that

6    are attributed to him in the Pre-sentence Report for example.

7         THE COURT:  Which?

8         MR. SCHOEN:  What is that Smira (phonetic).  I've

9    addressed all of my objections, Judge.  It's Document 1924.

10   These are to the extent this -- these were to the extent these

11   were in the Pre-sentence Report that we got, the updated one.

12        THE COURT:  Okay, so are you calling witnesses at

13   this Fatico hearing?

14        MR. SCHOEN:  Yeah, what I would propose to do, Judge,

15   again, is provide a sentencing memo ahead of time to try to

16   delineate the issues that I think would be appropriate for a

17   Fatico hearing.

18        That would depend on the Pre-sentence Report and what

19   was indicated to me after I filed my objections in an addendum

20   that the Court would still be relying on.  That would focus

21   then on what witnesses I would call.

22        But yes, I think if the Court intended to rely on the

23   idea that Vic Orena's role in this case was ordering all of

24   these murders that have been attributed to him and so on, then

25   yes, I'd like to call Frank Sporaco, for example, this top

1    echelon confidential informant who would tell the Court that it

2    was nothing like that.

3              THE COURT:  Where --

4              MR. SCHOEN:  He was working closely with Weissman,

5    Stamboulidis, and this crew and that DeVecchio knew that he,

6    Sporaco, and Scarpa were on the street committing murders,

7    facilitating that by providing addresses.  If the Court --

8              THE COURT:  Where was Mr. Sporaco now?

9              MR. SCHOEN:  I have no idea, Judge.  He was in

10   witness protection.  He's reached out a couple of times over

11   the years, but I don't know where he is.

12             THE COURT:  Reached out to you?

13             MR. SCHOEN:  Not to me personally.  He asked that I

14   call his lawyer.  I never reached the fellow, but he reached

15   out to Mr. Orena's son.  A letter was provided under seal a

16   couple of years ago to Judge Weinstein.

17             THE COURT:  He reached from WITSEC?

18             MR. SCHOEN:  I don't know if he was still in or he

19   took himself out, Judge.

20             THE COURT:  Okay, all right, I mean, so I'm just

21   trying to figure out the order of operations here.  I think

22   given what you're proposing, it makes the most sense to get the

23   Pre-sentence Report as quickly as we can and I'll have

24   questions for a moment for our Probation -- our guest from

25   Probation about when that is expected.

1          You can write a sentencing submission telling me in

2    light of the PSR exactly why you think *de novo* re-sentencing is

3    required.

4          Following that, the Government can respond.  And

5    following that, I can render a decision in the first instance

6    about whether *de novo* re-sentencing would be appropriate here

7    and if so, why?

8          The one thing I just wanted to hear additionally from

9    you about is all of this effort that you've devoted to showing

10   that the Government belatedly changed its position on the

11   requirement of re-sentencing and what you say was your reliance

12   on their prior position to your detriment, is that -- are you

13   make some sort of estoppel argument?  What is it that all that

14   amounts to legally?

15         MR. SCHOEN:  Well, I am Your Honor, making that

16   argument.  Pena is what Pena is.

17         THE COURT:  On what legal basis?

18         MR. SCHOEN:  Pena allows discretion, Judge.

19         THE COURT:  Right.

20         MR. SCHOEN:  The Government had an opportunity since

21   December 13th of 2022 or again after January 27th to raise the

22   issue there shouldn't be a re-sentencing in the case.

23         Re-sentencing in the case has a number of

24   implications in terms of timing and other -- and Mr. Orena's

25   rights with respect to the 2255, et cetera.

1    We relied all along on the idea that there would be a

2    full *de novo* re-sentencing.

3    THE COURT:  How did you rely to your detriment?

4    MR. SCHOEN:  With respect to the timing issue, Judge.

5    I mean, if the -- at a full re-sentencing, all of these issues

6    that would take place in a 2255 that the Government is going to

7    argue is procedurally barred and it's going to go on for years,

8    all of those issues should be taken up here.

9    And by the way --

10    THE COURT:  So, I'm sorry, you're saying if you had

11    known that the Government would oppose re-sentencing, then

12    what?  What would you have done differently?

13    MR. SCHOEN:  Well, first of all, I would have fought

14    on that issue but second --

15    THE COURT:  Are you fighting on that issue now?

16    MR. SCHOEN:  Yeah, a good bit later two years later

17    or --

18    THE COURT:  So you're saying it would have affected

19    your -- so your decision was you want to put re-sentencing on

20    the back burner.  We think the more important path on which to

21    proceed here is compassionate release?

22    MR. SCHOEN:  Yeah, I wouldn't say back burner.  I

23    thought compassionate release would have and should have been

24    the most efficacious course to get Mr. Orena released for the

25    reasons that I've previously said.

1      THE COURT:  Right, but you're saying if you'd known

2  they were going to oppose re-sentencing then you would have

3  reversed --

4      MR. SCHOEN:  I would filed -- briefed the 2255 and

5  proceeded on that track, too.  There are some procedural issues

6  with that.  The Count hasn't been vacated here yet.  I don't

7  know how -- what I'm doing the 2255 to.  I don't know what the

8  final sentence is in the case.

9      THE COURT:  What do you mean you're not -- you don't

10  know what you're doing the 2255 to because we haven't formally

11  vacated?

12      MR. SCHOEN:  Hasn't been formally vacated.  There's

13  no new sentence in the case.  One way or another, there's going

14  to be a new sentence in the case.

15      THE COURT:  That's right.

16      MR. SCHOEN:  2255 gets filed to that.  I addressed

17  this in the papers filed earlier in this case.  And the

18  Government suggested by the way --

19      THE COURT:  But couldn't you have, just for my

20  edification, you could -- if your 2255 motion was to be a

21  challenge to one or more convictions, not sentencing on those

22  convictions, but the propriety of the underlying conviction

23  itself, there was no logical or legal reason why briefing of

24  the newly-discovered evidence basis for 2255 relief had to

25  await re-sentencing, is there?

1           MR. SCHOEN:  Respectfully, I disagree, Your Honor.

2    After a --

3           THE COURT:  Why?

4           MR. SCHOEN:  Because after a re-sentencing, Your

5    Honor, as was anticipated by the Government, Mr. Orena would

6    also have a direct appeal following that at which he could

7    raise the issues raised.  That's Magwood.  That's the Magwood

8    case.  So that would be giving up --

9           THE COURT:  But I understand we would.

10          MR. SCHOEN:  I would be giving up all of those

11   rights, Your Honor if I filed a 2255 beforehand.

12          THE COURT:  You would be giving up the right to?

13          MR. SCHOEN:  Have a direct appeal, a direct appeal

14   before I had to do another 2255, which as successive 2255 has

15   certain procedural obstacles that the direct appeal wouldn't

16   have.

17          THE COURT:  So let me just -- let me get this

18   straight.  You have a direct appeal from re-sentencing.  So if

19   I -- let's say I hold a full *de novo* re-sentencing proceeding

20   here and --

21          MR. SCHOEN:  Yeah, I hesitated to raise it, Judge,

22   because now, it's -- you know, I'm afraid that's going to work

23   against me for getting the full re-sentencing because now we're

24   going to see a direct appeal.  And that's going to go on longer

25   and longer.

1          You know, I hesitate to even raise that today, but

2     that's the reason.  The Court asked me --

3          THE COURT:  I'm not following the logic of why you

4     couldn't be proceeding on both tracks simultaneously asking for

5     a different sentence in the re-sentencing proceeding, but

6     asking for *vacatur* of the underlying convictions in the 2255

7     petition in the first instance to me and then maybe to the 2nd

8     Circuit.  You're saying you would have been legally prohibited

9     or just that you would have lost a second bite at the apple?

10          MR. SCHOEN:  I think both.  I think there's a

11     question whether the 2255 could have been filed when we know

12     that there's not a final judgment in place.  We know that the

13     count has to be vacated.

14          THE COURT:  Oh, I see.

15          MR. SCHOEN:  So there's no final judgment in place.

16          THE COURT:  I see, okay.  I'm not saying I agree when

17     I say I see.

18          MR. SCHOEN:  I --

19          THE COURT:  I'm saying I understand your argument.

20     Okay.

21          MR. SCHOEN:  Judge, one other issue I suppose we

22     should address because we don't want to just have come back and

23     deal with it again would be this competency issue.  I certainly

24     --

25          THE COURT:  Yeah.

1          MR. SCHOEN:  I don't know that the Court intends

2     to --

3          THE COURT:  Can I just -- just so I can understand

4     the timeline here ask the Probation Department assuming you're

5     going to conduct an interview of Mr. Orena's son, assuming,

6     when do you think it would be reasonable to expect a revised

7     Pre-sentence Report?

8          MR. TONER:  Your Honor, regarding a revised Pre-

9     sentence Report, if we're strictly talking about Part C, which

10    is biographical, his medical history, his current status, his

11    financials, that would be approximately two or three months.

12    If we're talking about the --

13         THE COURT:  Why -- that sounds like a lot of time

14    when we're --

15         MR. TONER:  I'm sorry, that would also include the

16    complexity of the offense conduct being revised as well, given

17    the already complex offense conduct with --

18         THE COURT:  Why would the offense -- are you asking

19    for the offense conduct section to be revised?  I think you

20    are.

21         MR. SCHOEN:  I think to at least reflect the

22    additional evidence that has come out, whether the Court agrees

23    with that or not --

24         THE COURT:  To reflect the additional evidence, okay.

25    Oh, so maybe this really is a two or three month process to a

1      new PSR.  I would hope not.  I would ask the Probation

2      Department just given that we're talking about an 89 year old

3      Defendant --

4                  MR. TONER:  Of course.

5                  THE COURT:  -- to accelerate with all deliberate

6      speed the production of this PSR, but that's helpful to know

7      that that's the --

8                  MR. TONER:  Yeah, I had reached out to my supervisor,

9      who approved this revised Pre-sentence Report.  And she's

10     saying given all the factors we're discussing today, it's

11     likely between three to five months, depending on the

12     complexity of the offense conduct that we're talking about and

13     investigating those potential changes to again the already

14     complex offense conduct that's in the existing Pre-sentence

15     Report.

16                 THE COURT:  Yeah, I think it is incumbent on the

17     defense, if I haven't made this clear enough already, not just

18     to ask for a revised PSR to reflect all the water that's gone

19     under the bridge in the last, you know, 30 years, but instead,

20     to be as specific as possible with the Government and the

21     Probation Department about exactly what you think the revised

22     PSR needs to do and to do things like providing contact

23     information for any individuals you believe the Probation

24     Department should be speaking to, even if it's ultimately up to

25     them whether they pursue that line or not.

1          What about the issue of competency?  I -- we looked

2     quickly.  We didn't find a case that said the following, but I

3     would imagine that common sense dictates this conclusion that

4     if the only possibility in a re-sentencing proceeding is that

5     the sentence be reduced, not elongated, that the Defense can

6     waive competency under those circumstances.  Maybe that's not a

7     common sense provision as much as I think it is.

8          Is it the Government's view that we can't proceed to

9     re-sentencing without a full competency evaluation even if the

10    only possible change in sentence here is downward?

11         MS. LASH:  Your Honor, I -- when I raised the

12    competency issue in the letter that I filed two weeks ago, I

13    did not intend to say the Court needs to immediately proceed to

14    a full competency hearing.

15         I think that it's incumbent on the parties and the

16    Court to be aware of this issue and discuss it, particularly

17    given, you know, the Defense's intention here to proceed to a

18    full de novo re-sentencing and then to direct appeal.

19         So this is where we see the competency issue arising

20    in the direct appeal context in a re-sentencing, saying I was

21    incompetent and the Court could not re-sentence me.

22         THE COURT:  What's the Government's position if I can

23    like --

24         MS. LASH:  The Government's position is that, you

25    know, these evaluations are done at Devens.  We would place a

1    phone call and see what kind of timing and how long this would

2    take.  I don't know the answer to that.

3              If, you know, I have not asked any of his medical

4    providers whether they have a view on, you know, if this is

5    appropriate or not.  I am simply going off of the statements in

6    Defense counsel's letter that you know --

7              THE COURT:  Well, Defense counsel has told us his

8    client at times at least literally does not know who he is that

9    he believes he's, I think you've said, the president of the

10   United States among other things.

11             Assume that -- assume that competency could not be

12   established here.  Then what?

13             MS. LASH:  Well, Your Honor, I think we go to the

14   2255 statute.  If competency couldn't be established, you know,

15   Your Honor has the option of --

16             THE COURT:  Why do you go to the -- if it's a

17   question of whether we can proceed to re-sentencing or not in,

18   you know, absent the Defendant's competence to understand

19   what's going on, why do we look at the 2255 statute?

20             MS. LASH:  Well, I think then you have the three

21   other options available to you instead of a full *de novo* re-

22   sentencing proceeding, right?  You can amend the judgment.  You

23   can order a new trial.  You can release the Defendant.

24             I -- this is a complicated circular situation and

25   I --

1          THE COURT:  We have a lot of moving parts here, I

2   agree.

3          MS. LASH:  And I -- what I understand is that

4   competency is required every sentencing.  I don't know the

5   answer what if --

6          THE COURT:  Yeah.

7          MS. LASH:  -- he is found to be incompetent.

8          THE COURT:  If there is an exception to the

9   requirement of competency for proceedings in which the

10  Defendant can only benefit, which I think is where we are here,

11  he can't obviously serve more than life imprisonment, I think

12  it's incumbent on the Defense to surface that case law and

13  bring it to our attention.  And it may be that we don't find it

14  in the 2nd Circuit, but we look more broadly.

15         MR. SCHOEN:  Yeah, Judge, first of all, the issue of

16  the direct appeal is a non-issue as the Government's cases that

17  they cite in the June 26th letter proved.  That's what happened

18  in those cases.  Here, I'm --

19         THE COURT:  Putting aside the case law for a second,

20  since I agree we're -- none of us are looking at case law now

21  that answers the question, what is your position on competency?

22  Are you saying we waive it and we don't think it's necessary or

23  are you saying let's do the competency hearing as quickly as

24  possible?

25         MR. SCHOEN:  Well, first of all, I think before a

1    hearing, I think we're talking about what the Government's

2    suggested was an evaluation.

3              THE COURT:  Right, sorry, not a --

4              MR. SCHOEN:  Here's what -- I'm sorry, Judge, I just

5    can't resist saying.  It's not fair for the Government to get a

6    pass on their position on competency.

7              On our compassionate release motion, we showed he has

8    -- suffering from advanced dementia terminal as the Guidelines

9    consider it now, that he doesn't know who he is, where he is,

10   et cetera.  Thinks he's the president, thinks he's the warden.

11             And the Government's answer was, oh, Mr. Orena poses

12   a risk when he's released of calling up his old colleagues and

13   getting back into the organized crime business.

14             I cite that in the letter that I filed under July

15   5th.  I have the transcript cite for it.  Who would Mr. Orena

16   tell the people he is, the president or the warden?

17             But now that we're in this posture, not compassionate

18   release, he can't be re-sentenced because he's not competent.

19   He couldn't understand, he can't assist.  It's not fair to give

20   him a pass on that --

21             THE COURT:  So therefore, what?

22             MR. SCHOEN:  Pardon?

23             THE COURT:  Therefore?

24             MR. SCHOEN:  Therefore, I think it should be raised

25   by the Court.  How is it that the Government's position was one

1    way on compassionate release and another way the other time?

2    My experience is --

3              THE COURT:  But I'm saying assume you can have any

4    outcome you want here on the competency issue?

5              MR. SCHOEN:  Yeah, I want compassionate release to be

6    granted because he's not competent.  That would be the outcome

7    I want.

8              THE COURT:  We already ruled on compassionate

9    release.

10             MR. SCHOEN:  You said any outcome that I want.

11   That's what I want.

12             THE COURT:  Okay.  Let me ask a more specific

13   question then.  I thought it was obvious enough.  Let's assume

14   you could have either, A, a determination from this Court that

15   no finding of competency is required because the re-sentencing

16   can only work in his favor or for any other reason, A.

17             Or B, you could have a competency evaluation that we

18   ask the Bureau of Prisons to conduct as quickly as possible.

19   What are you -- which one do you want?

20             MR. SCHOEN:  I think of those two choices, the first.

21   My concern with the second is what the result would be if he

22   were to be found --

23             THE COURT:  Okay.

24             MR. SCHOEN:  -- incompetent.

25             THE COURT:  If he were to be found?

1          MR. SCHOEN:  Incompetent.  There's a number of

2    possibilities.  I have this arise in death penalty cases all

3    the time.

4          Is there to be a civil commitment proceeding after

5    that?  Is he just going to be institutionalized for life

6    because he's not competent enough to participate in the

7    sentencing herring?  That's what the safety valve frankly

8    compassionate release, one of the reasons I believe it exists.

9          But in any event, yes, my preference would be that he

10   go forward.  I don't know.  I tried to put in the letter a

11   little bit and I spoke to Government counsel about this.  I

12   don't know what the answer is as to his competency.  I had a

13   conversation with him the other day for the first time in I

14   don't know 20 or 30 years.

15         I spoke to the case manager about him.  We have the

16   record.  The medical records speak for themselves.  He's

17   clearly a person with advanced dementia.

18         The two questions are would he understand the

19   sentencing proceedings and would he be able to assist with the

20   sentencing proceedings?

21         It is his Sixth Amendment right.  And therefore, I

22   think if I were to say I think we should go forward, I'm not

23   asking for the competency evaluation or hearing.  I think we

24   should go forward with the sentencing, then I think it could go

25   forward.

1          I also think there are cases out there that suggest

2     the Court has an independent interest in ensuring the integrity

3     of the process.  This might --

4          THE COURT:  Can you send me a letter in the next 48

5     hours?

6          MR. SCHOEN:  No, I cannot.

7          THE COURT:  Or next week as -- can you send me.  It's

8     your, you know, time pressure.  Can you send me a letter as

9     quickly as you can whatever you want indicating in writing that

10    you do not believe a competency determination is required one

11    way or the other and citing whatever authority you can muster

12    for that proposition, legal authority for that proposition?

13         MR. SCHOEN:  I think it would just -- I'll write it,

14    but I think it would be a mix of decisions starting let's say

15    Estelle v. Smith and the cases that say if a defendant doesn't

16    ask for the competency hearing, then for example his statements

17    can't be used against him, those kinds of cases that talk about

18    it's the Defendant's Sixth Amendment right at issue with

19    respect to competency.

20         But I don't think we're going to find cases that say

21    -- I don't think so.  The Defendant could waive it.  I mean,

22    I've done a good deal of research on this is a death penalty

23    realm.

24         THE COURT:  Maybe it can't be waived.  Maybe that's

25    why we can't find the cases.

1              MR. SCHOEN:  Yeah.

2              THE COURT:  Right?

3              MR. SCHOEN:  Then what's the answer, Judge?  I mean,

4    there are article after articles that I've pulled now.  I could

5    also provide to the Court that talk about -- the Marshall

6    Project just did a piece on this, a lengthy piece, talks about

7    the horrible situation in the criminal justice system in which

8    people who are not competent to stand trial let's say are

9    simply institutionalized for life without having been convicted

10   of a crime, et cetera.  And here it means --

11             THE COURT:  On the basis of a simple finding that

12   they remain a danger to themselves or others?

13             MR. SCHOEN:  Not necessarily.  Just not competent to

14   -- not competent to participate.  And they're warehoused.

15             THE COURT:  Okay.

16             MR. SCHOEN:  And I think I can provide to the Court.

17   I'll provide the Court with the studies.

18             THE COURT:  I think we touched on this issue only

19   glancingly in the last round of papers and that there may be

20   more that you want to say on this topic.  I invite you to say

21   that if you can.

22             Okay, so that -- this is my, you know, sort of

23   working proposal on the table.  And the Government should tell

24   me what they think is wrong or otherwise in need of adjustment

25   with this proposal now.

1          The way of your proposal is as quickly as possible

2    we're working on a revised Pre-sentence Report, point one.  As

3    quickly as possible, we are working on coming to a view on

4    whether it is necessary to establish competency before we

5    proceed to re-sentencing or not.

6          If we decide that the competency evaluation is

7    required, we're going to try to get that done as quickly as

8    possible.

9          And as soon as we get a revised PSR, we will hear

10   from the Defense on whether they think a hearing, a Fatico

11   hearing, is required and if so, why.

12         And then, I'll render a decision as quickly as I can

13   about whether we're going to have a full *de novo* re-sentencing,

14   and if so, what that would look like.

15         Or whether I'm content to proceed on the papers along

16   the lines of what Judge Cogan did in the opinion I've cited

17   today, essentially giving reasons in writing why *de novo*

18   sentencing is not an appropriate or necessary exercise of

19   discretion in this case.  Does that make sense?

20         MS. LASH:  It does, Your Honor.  I'll just raise two

21   points.  I think as to the revised PSR, some of the issues that

22   Defense counsel raised, you know, it sounds can be implemented

23   quickly and easily.

24         The biographical information or the pedigree

25   information, the family interview, the interview of Mr. Orena,

1    if that's necessary.

2           My concern is the discussion of revised offense

3    conduct.  Mr. Orena was convicted after a month-long trial.

4           THE COURT:  I agree.  So sentencing is not a venue --

5    re-sentencing, even *de novo*, is not a venue for re-trying the

6    underlying case.

7           And that's why I had questions today for Mr. Schoen

8    about whether he wouldn't be better suited to proceed in the

9    2255 rubric than the *de novo* re-sentencing rubric, at least in

10   the first instance.

11          But we have the answer here.  We have, look, Mr.

12   Schoen will do what Defense counsel do.  It'll argue the facts

13   to the Probation Department.

14          He'll tell them that they should be taking, you know,

15   30 years of newly-discovered evidence into account and writing

16   that up in the PSR.  And the Government will have an

17   opportunity to weigh in and the Probation Department will write

18   the Pre-sentence Report they write, right?

19          And then, to the extent there are objections to

20   things that are in the report or things that are omitted from

21   the report that somebody believes is material, we'll

22   contemplate another Fatico hearing as necessary.

23          MS. LASH:  Understood, Your Honor.

24          And then, just briefly, my second point is on the

25   first issue that you raised, which is after Pena, whether a *de*

1     *novo* re-sentencing is mandatory in the context of a Defendant

2     facing no mandatory counts of conviction.  And what does purely

3     ministerial mean?

4           So I just want to point the Defense counsel and the

5     Court's attention to the Ayyad decision in the 2nd Circuit,

6     which I think answers this question.  And I have copies here

7     for the Court and for Defense if you'd like them now or after

8     the hearing.

9           And very simply in the Ayyad decision, the district

10    court denied --

11          THE COURT:  Remind me what month and year the Ayyad

12    decision is rendered in?

13          MS. LASH:  Your Honor, it's February 14th, 2023.

14          THE COURT:  Okay.

15          MS. LASH:  I'll hand a copy to your clerk.

16          THE COURT:  Thank you.

17          MR. SCHOEN:  I have it.

18          MS. LASH:  Your Honor, in the Ayyad decision, the

19    district court denied a *de novo* resentencing for a defendant

20    who was facing what was a *de facto* life sentence.  However, it

21    was not a mandatory life sentence.

22          The sentencing court opted simply to correct the

23    judgment, rather than holding a full *de* -- sentencing hearing,

24    given the facts of the case, the nature of the crime, the time

25    remaining on the sentence, and the defendant's age.

1        The 2nd Circuit affirmed this as a correct use of the

2   district court's discretion when determining whether a *de novo*

3   sentence should happen.

4        THE COURT:  Right, but I think that is logically

5   dependent on your assertion and maybe mine that even a *de novo*

6   re-sentencing proceeding is not the proper vehicle for a

7   challenge to the underlying conviction.

8        MS. LASH:  Yes, Your Honor.

9        THE COURT:  The same way a compassionate release

10  motion is not the vehicle for a challenge to the underlying

11  conviction.

12       This may be so obvious that case law's not necessary,

13  but have you cited case law that says re-sentencing is not the

14  vehicle for --

15       MS. LASH:  No, Your Honor, but I'll certainly look

16  for it.

17       THE COURT:  Can you put that letter in?

18       MS. LASH:  I can.

19       MR. SCHOEN:  Judge, if I may, this is an

20  extraordinary case.  It may be that --

21       THE COURT:  Well, that's why I'm saying.  So I think

22  it's possible that Mr. Ayyad's situation can be distinguished

23  from this one in that Ayyad at least accepted the validity of

24  the conviction that led to the life sentence.  So that wasn't

25  really a moving part in any re-sentencing, whereas you, in

1    contrast, dispute the conviction that led to the life

2    sentences.

3          MR. SCHOEN:  But Judge, even if you take Ayyad under

4    3553(a) factors, Ayyad was a World Trade Center bomber.  He got

5    1,400 months of his sentence.

6          What the judge found is, having been familiar with

7    the facts, there was no way possible he was going to get any

8    less a sentence.

9          THE COURT:  That sounds like what Judge Weinstein was

10   saying to me at your client's sentencing as well.

11          MR. SCHOEN:  And --

12          THE COURT:  And so, I think --

13          MR. SCHOEN:  And what we know since then is a number

14   of very specific things that affect the 3553(a) factors.  And

15   by the way, Judge, the reason I cite the Monteleone and the

16   Russo (phonetic) cases --

17          THE COURT:  Where -- is it obvious to you that the

18   strength of the evidence on the counts of conviction is a

19   3553(a) factor?

20          MR. SCHOEN:  Yes, it is, Judge, because --

21          THE COURT:  Where?

22          MR. SCHOEN:  -- what the Court relied on was

23   3553(a)(2)(A), the seriousness of the offense to promote

24   respect for the law and provide just punishment.  And the Court

25   --

1          THE COURT:  The seriousness of the offense is a very

2    different thing from the weight of the evidence supporting the

3    conviction.

4          I'm not -- I don't -- I'm not saying this to debate

5    you.  I'm saying this because you're asking --

6          MR. SCHOEN:  Judge --

7          THE COURT:  You're asking for something that I at

8    least as I sit here am not convinced is appropriate on re-

9    sentencing.

10         MR. SCHOEN:  But re-sentencing, Judge, respectfully,

11   is about the Defendant's role.  Monteleone, the court said, had

12   a leadership role --

13         THE COURT:  Right, and the jury concluded what it

14   concluded.  You're asking me I think to presume or to start

15   from the premise that the convictions in this case were

16   unfounded.

17         MR. SCHOEN:  Well, Judge --

18         THE COURT:  No?

19         MR. SCHOEN:  -- respectfully, what I think the Court

20   is telling me is that it shouldn't consider.  It should ignore

21   the abundant evidence over decades that the case simply wasn't

22   presented as it should have been, that the Government withheld

23   material information in this case and that we know that now.

24         It's a very different case.  When Mr. Stamboulidis

25   argues to the jury in this case that if you have any reason to

1    believe that Agent DeVecchio would have told you a lie, you

2    should acquit this Defendant.  Any reason to believe?

3    DeVecchio's a murderer.  DeVecchio was giving information to

4    informants on how to kill other people.

5         If you believe Scarpa, Jr., he rode in a car and

6    admitted to a murder that he did with DeVecchio of a nurse.

7    The evidence is extraordinary.  That's a different case.  And

8    that by the way --

9         THE COURT:  Sorry, where is the evidence that Scarpa

10   and DeVecchio traveled to a murder scene together?

11        MR. SCHOEN:  Rancio's (phonetic) been debriefed at

12   length by the District Attorney's Office and the U.S.

13   Attorney's Office.  That's the --

14        THE COURT:  are those debrief --

15        MR. SCHOEN:  -- Skolnick (phonetic) murder.

16        THE COURT:  Those debriefings are not part of the

17   record here needless to say and are they even part of the

18   public record anywhere?

19        MR. SCHOEN:  Could be part of the Molyneaux

20   (phonetic) filing.  I'd have to look at that again --

21        THE COURT:  Okay.

22        MR. SCHOEN:  -- in the District Attorney's Office.

23        THE COURT:  All right.

24        MR. SCHOEN:  But in any event --

25        THE COURT:  Just humor me, humor me and brief the

1    question that I'm asking now, even though you think the

2    answer's obvious whether reasons to doubt the foundation for

3    the jury verdict are an appropriate basis on which to re-

4    sentence somebody to a lower -- you may be right.

5           There may be cases in which a federal judge says,

6    look, years have passed, new evidence has come to light that

7    calls the jury verdict into question and on a 3553(a) *de novo*

8    re-sentencing analysis, I'm going to take that into account and

9    to order a sentence of time served.

10          You may be right.  I haven't seen those cases and I'd

11   be interested to see them.

12          MR. SCHOEN:  You know, Judge Block sort of alludes to

13   it in his decision, but it's in the context of a 3582, but the

14   reason I --

15          THE COURT:  I'm talking about circuit case law here.

16          MR. SCHOEN:  Oh, okay.

17          THE COURT:  Or statutes.

18          MR. SCHOEN:  You mentioned Judge Cogan before, so I

19   thought the Court considered other judges in this district to

20   be persuasive at least.

21          THE COURT:  I certainly do, but this is a pretty

22   foundational -- so we mentioned Judge Cogan on the analysis of

23   whether he fell -- his re-sentencing fell into the ministerial

24   or the nonministerial category because his opinion was

25   referenced in the Pena case, but yes.

1          MR. SCHOEN:  Okay, Judge, I think we have our

2    marching orders.

3          THE COURT:  I think we've got our marching orders.

4          Anything else from the Probation Department before we

5    adjourn?

6          MR. TONEY:  Yes, just to -- excuse me, just to

7    confirm for what is expected of the Probation Department, so

8    for the fully revised PSR, we are going to update the

9    biographical information, his health, and we are going to

10   interview his son as well as the Defendant prior to a

11   competency hearing?  Is that my understanding?  We're going to

12   interview him as we normally would?

13         THE COURT:  I'm not ordering you to do anything.

14         MR. TONEY:  Okay.

15         THE COURT:  I'm telling you be in contact with the

16   Government and the Defense counsel about what they believe

17   should or should not be part of any revised Pre-sentence

18   Report.  Make your own --

19         MR. TONEY:  Okay.

20         THE COURT:  -- well-informed decision on the same,

21   you know, principles and processes that you normally operate on

22   as to whether you should do those things or should not do those

23   things.

24         MR. TONEY:  Understood.

25         THE COURT:  You might say we never interview people's

 1    children.  I seriously doubt you would say that, but you know,

 2    whatever your normal procedure is, in the first instance, you

 3    should follow it.

 4           And if, you know, that leads to disputes about what

 5    should be included or excluded, those can be litigated at the

 6    appropriate time.

 7           I'm just saying whatever is happening with the PSR,

 8    the Defense should tell you as soon as possible what they want

 9    to see in it, so that you can decide to acquiesce or not to

10    those requests.  And then, as soon as possible you should

11    complete whatever you're going to complete.

12           MR. TONEY:  Okay, understood, Your Honor.

13           THE COURT:  Anything else from the Government before

14    we adjourn?  Do you have clarity on what I'm leaving you with?

15           MS. LASH:  Yes, Your Honor.

16           THE COURT:  Okay, and from the Defense?

17           MR. SCHOEN:  Yes, Your Honor, I'll tell the Court, I

18    mean, the Court suggest -- not suggested, the Court wrote in

19    its decision denying the compassionate release it is without

20    prejudice to raise it again if Mr. Orena's health condition

21    warrants it.

22           As I've apprised the Court, Mr. Orena had another

23    heart attack and some procedures involved with that.  Clearly,

24    his dementia is advancing.

25           I don't know what the Court has in mind.  I don't

1      intend to burden the Court with, you know, filing a new

2      compassionate release motion every week, but --

3                  THE COURT:  Right.

4                  MR. SCHOEN:  But on the other hand, his condition

5      certainly is worsening.  I mean, he'll be 89 next month.  He's

6      confined to a wheelchair.  He cannot control various bodily

7      movements.

8                  And anyway, I'd be happy to describe my conversation

9      with him.  It's a very sad situation, but -- so I may file

10     another compassionate release.

11                 It's very difficult for me to get the medical records

12     from this place.  And I can't talk to the doctors involved.

13                 MS. LASH:  Your Honor, I'm happy to obtain his

14     medical records and share them with Defense counsel.

15                 THE COURT:  Thank you.

16                 MR. SCHOEN:  And the Government did intervene in the

17     past to get me -- help to get the medical records once before,

18     but the doctors won't speak to me, unfortunately, even with a

19     release, so.

20                 THE COURT:  Who will they -- will they speak to his

21     son?

22                 MR. SCHOEN:  Not really.  He's put -- they used to.

23     Before the litigation started with compassionate release --

24                 THE COURT:  Oh, I see.

25                 MR. SCHOEN:  -- he had a pipeline to one doctor who

1    was very friendly and very helpful.  But since then, I asked

2    the case manager whether I could quote her on anything.  And

3    she said, no, it's really against policy.  She was very nice to

4    speak candidly to me, but I'm not in a position to quote her.

5         THE COURT:  Understood.  All right, I think this has

6    been productive in charting a path forward.  And we will all

7    act expeditiously on our own separate tracks.  Thank you all.

8    We're adjourned.

9         MR. SCHOEN:  Thank you.

10        MS. LASH:  Thank you, Your Honor.

11        (Proceedings concluded at 11:29 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **CERTIFICATE**

2

3

4            I, Chris Hwang, court approved transcriber, certify

5    that the foregoing is a correct transcript from the official

6    electronic sound recording of the proceedings in the above-

7    entitled matter.

8

9

10

11

12

13    _____          July 7, 2023

14    Chris Hwang                  Date

15    Court Reporter

16

17

18

19

20

21

22

23

24

25