**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

271 Cadman Plaza East
Brooklyn, New York 11201

TH/MEF:DEL

April 28, 2025

By ECF

The Honorable Eric R. Komitee
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Victor J. Orena
               Criminal Docket No. 92-351 (EK)

Dear Judge Komitee:

      The government respectfully submits this letter in opposition to defendant Victor Orena's motion for early release dated April 18, 2025 and filed pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). See ECF No. 1976 ("Def. Mot."). Primarily, the defendant's motion should be denied because this Court lacks jurisdiction to modify his sentence given that the defendant has an appeal pending in the Second Circuit regarding this Court's denial of the defendant's motion for a de novo sentencing and related issuance of amended judgment. See United States v. Orena, Case No. 24-835 (2d Cir.). In any event, as this Court has previously determined — and as the Second Circuit affirmed — the defendant's motion should be denied because the considerations set forth in 18 U.S.C. § 3553(a) weigh heavily against release.

    I.    Background

      While the Court is amply familiar with the underlying facts and lengthy procedural history of this case as it has been recounted in the government's previous filings, the government recites them herein for the Court's ease of reference.

    A.    Offense Conduct

      In the early 1970s, Orena began associating with the Colombo organized crime family of La Cosa Nostra (the "Colombo Family"). PSR ¶ 35.[1] La Cosa Nostra, also known as the Mafia, includes five New York families—the Bonanno, Colombo, Gambino, Genovese, and

---

[1] The Presentence Investigation Report was initially prepared on April 1, 1993 and revised on May 24, 2023.

Lucchese families—each headed by a boss. Orena was inducted as a member of the Colombo crime family in 1977. Id.

By 1988, Carmine Persico, the official boss of the Colombo Family despite being incarcerated, appointed Orena the family's acting boss. Id. ¶ 36; United States v. Orena, 32 F.3d 704, 708 (2d Cir. 1994) (hereinafter "Orena Direct Appeal") (noting trial testimony established this occurred between 1988 and 1990). However, Persico and Orena agreed that Orena would step down as acting boss when Persico's son Alphonse "Little Allie Boy" Persico was released from federal prison, so that Alphonse Persico could assume control of the Colombo Family. PSR ¶ 37. Discord marked Orena's leadership of the Colombo Family. Several members of the crime family testified in various trials that Orena retained an "excessively large share" of the crime family's criminally derived proceeds at the expense of other members. Id. ¶ 38.

Then, in the early 1990s, when Alphonse Persico was released from prison and sought to take control of the Colombo Family as anticipated, Orena refused to cede leadership, igniting an internecine war within the Colombo Family. Id.; Orena Direct Appeal, 32 F.3d at 708. On one side were those loyal to Orena, who supported his elevation to official boss; on the other were those loyal to Carmine Persico and Alphonse Persico, led by Orena's former consigliere Carmine Sessa. PSR ¶ 38. As this Court explained, "[t]his resulted in conflict between Orena and Persico factions of the Colombo Family in 1991 and 1992, including a number of assassinations and attempted assassinations." Orena Direct Appeal, 32 F.3d at 708. Aware of Sessa's resentment, Orena conspired to assassinate Sessa in June 1991. PSR ¶ 39. Although Sessa learned about Orena's plan to kill him and plotted to kill Orena instead, Sessa's plan failed. Id. ¶¶ 39-40. A tenuous peace ensued until November 1991. Id. ¶ 41.

In November 1991, Orena and his supporters broke the fragile truce by attempting (unsuccessfully) to kill Persico loyalist Gregory Scarpa, Sr. Following this attempt, the conflict erupted, and members of both factions actively sought to kill members of the opposing faction. Id. The hostilities resulted in the attempted assassinations, woundings, or successful assassinations of at least 28 people, three of whom were innocent bystanders. Id. ¶¶ 43, 54. One innocent bystander, 18-year-old Matteo Speranza, was murdered while working in a bagel shop owned by two reputed Persico loyalists. Id. ¶ 55. Several other innocent bystanders were injured in the feud, including a murder victim's girlfriend who was struck by a stray bullet, and several pedestrians (including a four-year-old girl) who were hit by a car whose occupants were fleeing from an assassination attempt by gunmen. See George James, Killing Tied to Mafia War in Brooklyn, N.Y. Times, Dec. 9, 1991, available at https://www.nytimes.com/1991/12/09/nyregion/killing-is-tied-to-mafia-war-in-brooklyn.html (accessed Apr. 21, 2024).

Orena was arrested in April 1992 and charged with racketeering, in violation of 18 U.S.C. § 1962(c); racketeering conspiracy, in violation of 18 U.S.C. § 1962(d); conspiracy to murder Thomas Ocera, in violation of 18 U.S.C. § 1959(a)(5) and New York Penal Law §§ 125.25 and 105.15; the murder of Thomas Ocera in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(1) and New York Penal Law Sections 125.25 and 20.00; conspiracy to murder members of the Persico faction of the Colombo Family in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(5) and New York Penal Law §§ 125.25 and 105.15; conspiracy to make extortionate extensions of credit, in violation of 18 U.S.C. § 892; conspiracy to make extortionate collections

of credit, in violation of 18 U.S.C. § 894; use and carrying of a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1); and unlawful possession of firearms by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). PSR at 1, 3, 5-6.

Evidence at trial demonstrated Orena's role within the Colombo Family, his aspirations to become the official boss, and his involvement in the internecine war between the Colombo Family factions. Orena Direct Appeal, 32 F.3d at 708.

Evidence also established Orena's role in the murder of Ocera on or about November 13, 1989. Id. Prior to his death, Ocera was a member of the Colombo Family. PSR ¶ 45. In connection with his membership in the family, Ocera collected extortion proceeds from various private sanitation companies and was a partner with Orena in a lucrative loansharking business. Id. ¶ 46. In October 1991, Michael Maffatore, a Colombo Family associate who helped bury Ocera's body, led agents from the Federal Bureau of Investigation ("FBI") to Ocera's grave site, where the agents found Ocera's body buried with a metal wire wrapped around his neck. Orena Direct Appeal, 32 F.3d at 708. A medical examiner concluded that Ocera's cause of death was strangulation. PSR ¶ 52. Ocera was survived by a disabled wife with multiple sclerosis and three daughters. Id. ¶ 53. At trial, the government offered the testimony of Maffatore and Harry Bonfiglio, who also helped to bury Ocera, regarding Ocera's murder. Orena Direct Appeal, 32 F.3d at 708.

Evidence at trial also established Orena's role in operating several illegal gambling establishments, as well as loansharking operations. PSR ¶ 56. Members of the Colombo Family loaned money at illegally high rates of interest, charging between two and five percent weekly interest—equivalent to 104 to 250 percent annually. Id. Testimony at trial indicated that Orena had $700,000 "on the street" (i.e., loansharking monies) and had received interest payments totaling $300,000 every year from 1986 to 1990. Id. ¶¶ 59-60.

In light of the ongoing violence, Colombo Family members actively concealed firearms in their possession. Orena Direct Appeal, 32 F.3d at 708. Between 1991 and 1993, law enforcement authorities recovered over 90 firearms from individuals connected to the Colombo Family conflict. PSR ¶ 43. When law enforcement agents arrested Orena in April 1992, they recovered nine loaded firearms, ammunition, a bullet-proof vest, and confidential telephone records for members of the Persico faction. Id. ¶¶ 44, 64.

Several other members of La Cosa Nostra testified about the racketeering and loansharking activities of Orena and the Colombo Family and about Orena's various murder conspiracies, including conspiracies to kill (1) Joseph Ambrosino, a Colombo Family associate; (2) Alfonso D'Arco, a former acting boss of the Lucchese Family; (3) Salvatore Gravano, former underboss of the Gambino Family and a government witness in several organized crime cases; and (4) Diane Montesano, Ocera's girlfriend at the time of his murder. Orena Direct Appeal, 32 F.3d at 708.

On December 21, 1992, after a month-long trial, a jury found Orena guilty of all counts. PSR ¶ 1.

Orena moved for a new trial pursuant to Federal Rule of Criminal Procedure 33, asserting that Gravano committed perjury and alleging prosecutorial misconduct relating to the testimony of Gravano and Montesano. The district court denied the motion. Orena Direct Appeal, 32 F.3d at 709.

B. Criminal History

Orena has two prior convictions in New York state criminal court. On May 11, 1976, Orena pleaded guilty to perjury in the first degree, in connection with lying in sworn grand jury testimony in an investigation related to assassination of Colombo crime family enforcer Joseph Gallo. On February 10, 1986, Orena pleaded guilty to conspiracy in the fifth degree to commit criminal usury (loansharking).

In addition to these convictions, as noted in the PSR, the government could also prove by a preponderance of the evidence that the defendant ordered the assassination of an individual named Gioachino "Jack" Leale for his purported blunder in concealing Ocera's murder. PSR ¶¶ 266-73. Following the discovery of Ocera's body, Leale was shot once in the back and six times in the head by several gunmen outside a hotel on Long Island. Id. ¶ 270. The government could show the defendant ordered Leale's murder for his failure to properly bury Ocera's body and to prevent Leale from testifying against the defendant at trial. Id. ¶ 272.

Furthermore, after the defendant's arrest and during his pretrial detention, he directed one of his children to contact a gun shop where Orena had illegally purchased a shotgun, retrieve and destroy any records of the purchase and instruct the shop owner to make false statements to law enforcement. Id. ¶ 71.

C. The Court's Sentence

Following Orena's trial conviction, Judge Weinstein sentenced Orena to life imprisonment on Counts One, Two and Four. In a sentencing memorandum, Judge Weinstein articulated his rationale for imposing a life sentence:

> Considerations of incapacitation and general deterrence overwhelm all other factors in the sentencing of . . . Orena . . . . These are not quotidian cases. These mobsters, working within their own and with other mobs, have thrived in and cultivated a complex and pervasive culture of crime that infests and sucks dry entire communities and industries within this city and surrounding areas. Harsh terms of imprisonment are required to incapacitate defendants and extract them from the net of criminal activity in which they have been enmeshed for their adult lives and to which they no doubt would return at the first opportunity. Severe sentences may also by general deterrence save youngsters who might be seduced into the criminal lifestyle of these mobsters.
>
> The testimony in these three trials [of Orena and co-defendants Michael Sessa and Pasquale Amato] detailed the highly organized, structured nature of the Colombo and other mobs. The pervasive

4

influence of the organized crime mobs in many of the formerly great industries of New York was made clear. The drain on the city's human and economic resources caused by this criminal activity has been a major factor in the deterioration of our social, political and economic infrastructure. The history of these families—their steady growth and repeated struggles for power internally and with each other—demonstrate that they are tenacious and will not easily be defeated. The culture of crime is potent. Its adherents know no other way.

The direct and indirect costs of these gangs to the honest people of the metropolitan area are measured in the billions of dollars. Whole industries have been poisoned and adversely affected. Waterfront activities and traffic by ships, aircraft and trucks, building trades, garment trades, convention and theatrical facilities, restaurants and even politics are among the innumerable areas where these malefactors have operated. Using their loansharking and shakedown techniques they have gained control over numerous businesses, often driving them into bankruptcy and causing the loss of great numbers of jobs. The direct costs to taxpayers of police surveillance and prosecutions run into the millions. And, of course, many individuals have been killed, maimed, or prevented from living in the peace and tranquility they were entitled to expect in our democratic society.

Incapacitation is the only means of preventing these defendants from perpetuating their criminal activity. Their past histories reveal them to be recidivists who cannot be rehabilitated. Their removal from society will prevent the further damage they are sure to cause and may have the added benefit of discouraging the inevitable successor generation that seems to arrive as soon as its forebears depart.

The testimony at trial revealed the extent to which mob life is shared and inherited through real families. Accomplice witnesses detailed how young, impressionable males in the Italian-American community have been lured into the destructive life of these mobs before they are able to recognize the better opportunities available to them. While court records indicate that the gangs themselves constitute only a miniscule percentage of this hard-working and law-abiding community, their reputations and representativeness have been grossly inflated to the detriment of the entire group. And they still are role models for a small—and decreasing—number of young men. It is tragic that even a relatively few young people with great potential for law-abiding lives should emulate these defendants and their ilk. Even when the aura of the mob was bright most youngsters in this community escaped from poverty of ideas and aspirations

through education and hard legitimate work. Now, with university open admissions policies and numerous role models—to name but a few, the Governor of New York, an Associate Justice of the United States Supreme Court and the former Chancellor of the New York City Schools and Dean of the Cardozo Law School—it is more important than ever to stamp out this baleful group of ruthless and cruel parasites who too often are mistakenly thought of as representing their community.

The task of rooting out these criminals is arduous. They must be removed one-by-one through burdensome and expensive prosecutions that amount to a guerilla war on organized crime. The increased number of members of gangs willing to testify and the deterioration in the quality of their leadership and membership does show the utility and efficiency of the tenacious and sometimes brilliant work of law enforcement agencies. The cost of these gangs to society, both in terms of dollars spent and in terms of the drag on human resources in our court system, preventing the smooth administration of civil justice, remains great.

Unrelenting pressure of hundreds of talented city, state and federal investigators over many years has now undermined the walls of secrecy surrounding these gangs. Many of their managing personnel now cooperate with the government. Sentences most severe are required if the final assaults on their citadels, while these gangs are disorganized and on the run, are to be successful. The tactics of Grant, not McClellan, are in order.

The Guidelines are of little assistance in these cases. They focus myopically on mechanical aspects of the offenses. Their formulaic scheme fails to account for the overall picture of these defendants developed during three trials and in three thorough and exhaustive presentence reports. These criminals must be punished in the proper context of their lives and their overall actions, not in the vacuum of "units," "offense levels" and "adjustments" created by the Guidelines.

These cases are extraordinary. Incapacitation and deterrence, 18 U.S.C. § 3553(a)(2)(B) and (C), far outweigh other factors encompassed by the statutes and Guidelines. All three defendants must be imprisoned for life. That the Guidelines require terms of life imprisonment demonstrates that appropriate sentences for these unusual defendants coincide with sentences meted out for those who have committed similar offenses in the past.

Sessa, 821 F. Supp. at 874-75.

D. Post-Conviction Litigation

Orena filed a direct appeal to the Second Circuit, raising multiple challenges to his conviction and sentence. Orena Direct Appeal (listing Orena's 11 claims on appeal). The Second Circuit rejected all of Orena's claims of error and affirmed the judgment and the order denying Orena's motion for a new trial. Id. at 717.

Orena and his co-defendant Pasquale Amato later moved for dismissal of their indictments or for new trials pursuant to Federal Rule of Criminal Procedure 33 and filed petitions pursuant to 28 U.S.C. § 2255, on the grounds that the government violated its disclosure obligations, in addition to other alleged misconduct. United States v. Orena, 956 F. Supp. 1071, 1076 (E.D.N.Y. 1997) (hereinafter "Orena First 2255 Petition"). Their claims were based upon allegations of criminal conduct by Colombo Family member Gregory Scarpa, Sr., who was also an F.B.I. informant, and by former F.B.I. Special Agent R. Lindley DeVecchio, who was Scarpa's F.B.I. "handler." Specifically, Orena and Amato alleged that it was not they, but rather DeVecchio and Scarpa, who had killed Ocera and instigated the internecine war within the Colombo Family. See id. at 1076-77.

Judge Weinstein held several evidentiary hearings which included the testimony of DeVecchio and his former partner, Special Agent Chris Favo. Id. In a lengthy opinion which exhaustively reviewed all of the evidence, Judge Weinstein categorically rejected the defendants' claims. See generally id. Specifically, although finding that DeVecchio had shown "lapses in judgment, failures in maintaining proper perspective and unfortunate slips in ability to participate in what is an inherently treacherous and ambiguous relationship," Judge Weinstein also found that the claim that DeVecchio had deliberately attempted to assist Scarpa during the Colombo Family war had been shown by "overwhelming evidence to have been demonstrably false and an egregious distortion of the record." Id. at 1103-04.

Judge Weinstein found the government had offered "compelling and voluminous proof of Orena's guilt," id. at 1078, including testimony of cooperating witnesses, recorded conversations, and physical evidence, id. at 1081–82. Judge Weinstein also found that "the DeVecchio–Scarpa relationship was irrelevant to any events or evidence relied upon by the government in the Orena . . . trial[]." Id. at 1090. He commented that Orena's argument that undisclosed information regarding the DeVecchio–Scarpa relationship was Brady material "require[d] crossing the line from rationality to paranoia." Id. at 1097. Finally, Judge Weinstein concluded, "[T]he DeVecchio–Scarpa connection had no discernable effect on the criminal activities of the defendants Orena and Amato or on their trials. Each defendant was driven by the strange calculus of the criminal mobster's mind and environment, not by the F.B.I., and not by Special Agent R. Lindley DeVecchio." Id. at 1112. Judge Weinstein accordingly denied the motions and dismissed the petitions.

The Second Circuit affirmed Judge Weinstein's decision by summary order, and the Supreme Court denied Orena's petition for certiorari. Orena v. United States, No. 97-2277 (2d Cir. Apr. 20, 1998) (summary order), cert. denied, 525 U.S. 874 (1998).

On January 17, 2003, Orena and Amato moved pursuant to Rule 60(b) of the Federal Rules of Criminal Procedure to vacate the judgment, attempting to present "further

7

'evidence' in a renewal of their attack on their convictions." Orena v. United States, 299 F. Supp. 2d 82, 83 (E.D.N.Y. 2004). Judge Weinstein held an evidentiary hearing on their new motions, which included the testimony of Gregory Scarpa, Jr., the son of Gregory Scarpa, Sr., and a convicted murderer and made member of the Colombo Family who was then serving a life sentence. Scarpa, Jr. testified that his father and DeVecchio had killed Ocera and instigated the Colombo Family war. See id. Judge Weinstein found that neither Scarpa, Jr. nor his "source" (i.e., Scarpa, Sr.) was credible and none of the newly presented evidence was persuasive. See id. at 84. Judge Weinstein remarked, "The court's decision of March 10, 1997 denying a similar collateral attack remains unshaken in its premises and findings." Id. The motions were denied.[2]

### E. 2021 Motion for Compassionate Release

In July 2021, Orena filed a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). ECF No. 1864. Orena sought release based on a litany of health conditions. Id. Orena also claimed that certain exculpatory evidence was wrongfully withheld and attacked the validity of his underlying conviction. Id.

The government opposed, stating that while Orena's plethora of medical conditions met the threshold "extraordinary and compelling reason" requirement, consideration of the 18 U.S.C. § 3553(a) factors indicated that Orena's release was not warranted. ECF No. 1866.

On October 27, 2021, after hearing oral argument on the motion, this Court denied Orena's petition for compassionate release. In a written opinion, the Court recognized that the government had conceded that Orena had shown "extraordinary and compelling" circumstances on account of his medical issues. ECF No. 1876. The Court noted, however, that a finding of "extraordinary and compelling" circumstances alone is not sufficient to warrant a sentence reduction, id., and that, even if Orena were eligible, the Court "may deny [his] motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override…what would otherwise be extraordinary and compelling circumstances." Id. The Court held that "Orena's medical issues, though undeniably serious, cannot outweigh the conduct that warranted his original sentence." Id. In reaching that conclusion, the Court considered the sentencing factors set forth in 18 U.S.C. § 3553(a), noting that the nature and circumstances of the offense conduct and the need for the sentence to reflect the seriousness of the offense, provide just punishment, and afford adequate deterrence "carry particular weight here." Id.

The Court recognized Orena's leadership role in the Colombo Family, his efforts in triggering a bloody war, his oversight of "a campaign of violence that resulted in a swath of death and serious injury," as well as crippling effects on the city's economy, his involvement in the conspiracy to murder members of the Persico faction, the murder of Thomas Ocera, his activities in prison since his conviction, and the Bureau of Prison's determination he poses a "minimum" risk for violence. The Court noted that while Orena asked the Court to consider so-called new evidence that undermined his conviction, such arguments are properly made in a

---

[2] A different motion by Anthony and Joseph Russo to vacate their convictions was denied by the Honorable Charles P. Sifton, who also found that Scarpa Jr.'s testimony was not credible. See Russo v. United States, No. 03-CV-2059, slip op. at 56-57 (E.D.N.Y. Nov. 24, 2004).

8

petition for habeas relief. Id. n.4 (citing United States v. Antney, No. 17-CR-229 (CBA), 2021 WL 4502478, at *5 (E.D.N.Y. Sept. 30, 2021)). Your Honor concluded, "I am left with the inescapable conclusion that any sentence short of the life term imposed by Judge Weinstein would insufficiently reflect the seriousness of the offense conduct here and fail to provide just punishment." Id.

Orena appealed from the denial of compassionate release and asked that briefing for Orena's Section 2255 petition be suspended until the conclusion of the appeal of his motion for compassionate release. ECF No. 1878. In June 2022, this Second Circuit affirmed the district court's denial of Orena's motion for the sentence reduction in a per curiam order. See United States v. Amato, 48 F.4th 61 (2d Cir. 2022). On appeal, Orena primarily contended that the Court erred in denying his motion pursuant to Section 3582 by refusing to consider, what Orena claimed was, new evidence that called into question the validity of his conviction. Id. at 63. The Second Circuit concluded that when considering a motion for sentence reduction pursuant to Section 3582(c)(1)(A), "a district court does not have discretion to consider new evidence proffered for the purpose of attacking the validity of the underlying conviction in its balancing of the 18 U.S.C. § 3553(a) factors. Facts and arguments that purport to undermine the validity of a federal conviction must be brought on direct appeal or pursuant to 28 U.S.C. § 2255 or § 2241." Id.

F.  2023 Request for Resentencing

Prior to filing his motion for compassionate release, Orena sought leave to file a successive 28 U.S.C. § 2255 motion, arguing his 18 U.S.C. § 924(c) conviction, predicated on conspiracy to commit murder in-aid-of racketeering under 18 U.S.C. § 1959(a)(5), was no longer valid after United States v. Davis, 139 S. Ct. 2319 (2019), and arguing that newly discovered evidence undermined the validity of his conviction. The Second Circuit granted the motion and transferred the proceeding to this Court on both grounds on September 24, 2020. See Orena v. United States, No. 20-1984 (2d Cir. Sept. 24, 2020).[3]

On April 14, 2023, at the direction of the Court, Orena filed a status report, seeking a de novo resentencing. ECF No. 1922 at 3. In support, Orena cited to a government letter from 2020 (ECF No. 1852) and to United States v. Powers, 842 F.3d 177, 179 (2d Cir. 2016). The government filed a letter opposing a de novo sentencing and asked the Court to amend the judgment to remove the Section 924(c) conviction and the accompanying sentence (ECF No. 1926), citing United States v. Peña, 58 F.4th 613, 618 (2d Cir. 2023); see also Tellier v. United States, No. 21-2959, 2023 WL 3608394, at *1 (2d Cir. May 24, 2023) (summary order).

The Court issued a memorandum and order denying the defendant's motion for a de novo sentencing and issued an amended judgment. ECF No. 1964. On March 28, 2024, Orena filed a notice of appeal. The Second Circuit heard oral argument on December 12, 2024. As of the government's filing, no decision has yet issued.

---

[3]  In 2021, Orena requested that this Court hold in abeyance his resentencing and successive § 2255 motion, which he indicated would include the presentation of the additional evidence, pending the outcome of the July 2021 motion for compassionate release.

9

II. Legal Framework

"A district court lacks the authority to alter a sentence after the time of sentencing, except where Congress has provided otherwise." United States v. Petit, 541 F. Supp. 3d 304, 309 (S.D.N.Y. 2021) (citing United States v. Addonizio, 442 U.S. 178, 189 (1979)). Section 3582(b) provides that, subject to certain narrowly prescribed exceptions, "a judgment of conviction that includes [a sentence to imprisonment] constitutes a final judgment." One of the exceptions is the compassionate release provision found in Section 3582(c)(1)(A), which allows a court to, upon the defendant's motion, "reduce the term of imprisonment (and . . . impose a term of probation or supervised release . . . that does not exceed the unserved portion of the original term of imprisonment)."

A court may modify a term of imprisonment upon a defendant's showing of "extraordinary and compelling reasons." See 18 U.S.C. § 3582(c)(1)(A)(i). A defendant may move for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the BOP to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." See id. at § 3582(c)(1)(A). Any such reduction must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The applicable policy statement is set forth in U.S.S. § 1B1.13.[4]

The existence of extraordinary and compelling reasons, however, does not per se compel compassionate release. Rather, courts must consider whether the factors under 18 U.S.C. § 3553(a), on balance, override the extraordinary and compelling reasons. If so, release will not be warranted. As one district court explained:

> It is important to note that a defendant who meets all the criteria for compassionate release consideration listed above is not thereby automatically entitled to a sentence modification. He is simply eligible for a sentence modification. The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not

---

[4] Although the Second Circuit held in United States v. Brooker, 976 F.3d 228 (2d Cir. 2020) that a prior version of U.S.S.G. § 1B1.13 was not "applicable" in light of subsequent statutory amendments and thus did not limit courts' discretion, the most recent amendments to U.S.S.G. § 1B1.13 "have harmonized the Policy Statement with the" statute. United States v. Feliz, No. 16 CR. 809 (VM), 2023 WL 8275897, at *4 (S.D.N.Y. Nov. 30, 2023). Brooker thus no longer controls and compliance with § 1B1.13 is once again mandatory. Id.; see also United States v. Messina, No. 11-CR-31 (KAM), 2024 WL 2801717, at *3 (E.D.N.Y. May 31, 2024) (ruling that the "'amended guidance as to what constitutes extraordinary and compelling reasons now controls a court's analysis of a defendant- or BOP-initiated petition for compassionate release.'" (quoting United States v. Saez, No. 16-CR-317 (PAE), 2024 WL 303847, at *3 (S.D.N.Y. Jan. 26, 2024))). Orena's motion misstates the applicable standard of law. Def. Mot. at 7, 15.

warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.

United States v. Gotti, 433 F. Supp. 3d 613, 615 (S.D.N.Y. 2020) (emphases added).

A defendant seeking relief bears the burden of proving that extraordinary and compelling reasons exist to justify early release. See United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); see also Gotti, 433 F. Supp. 3d at 619 (defendant "has the burden of showing that 'extraordinary and compelling reasons' to reduce his sentence exist").

III.     The Court Lacks Jurisdiction to Consider Orena's Motion

As a preliminary matter, Orena's appeal concerning his resentencing is pending with the Second Circuit and, as a result, this Court lacks jurisdiction to grant the instant motion and modify his judgment. See, e.g., United States v. Holmes, No. 09-CR-756 (CBA), ECF No. 86 at 4 ("Holmes's pending appeal deprives this Court of jurisdiction to grant his motion for a reduction of his sentence."); United States v. Skelos, No. 15-CR-317 (KMW), 2020 WL 2508739, at *1-2 (S.D.N.Y. May 15, 2020) (explaining that "[t]he filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal," and holding that "Defendant's pending appeal deprives this Court of jurisdiction to grant his motion for compassionate release"); United States v. Campbell, No. 6:06-CR-06105(EAW), 2020 WL 1958486, at *2 (W.D.N.Y. Apr. 21, 2020) (denying motion for compassionate release because "Defendant is seeking a substantive modification to his sentence, and this Court lacks the jurisdiction to grant this relief because of Defendant's pending appeal"); see also Griggs v. Provident Consumer Disc. Co., 459 U.S. 56, 58 (1982) ("Although the district court retains the ability to correct clerical errors, it may not substantively modify judgments." (internal quotation marks omitted)).

Because Orena asks the Court to modify its judgment, this Court lacks jurisdiction to address his motion. See United States v. Ransom, 866 F.2d 574, 575–76 (2d Cir. 1989). Accordingly, the Court may deny the motion, defer considering it during the pendency of the defendant's appeal, or issue an "indicative" ruling under Rule 37 of the Federal Rules of Criminal Procedure. In the current posture of the case, however, the Court cannot modify its judgment by reducing the defendant's sentence.

IV.      The Court Should Not Disturb the Three Life Sentences Imposed

Even in the current jurisdictional posture, the Court can, however, deny Orena's motion for compassionate release. Given the serious nature of Orena's crimes, which included the murder of one individual and a plot to kill a dozen more as the acting head of the Colombo Family; his disregard for the law and human life; and the need to ensure adequate punishment, and general deterrence, the Court should not disturb the three life sentences Orena faces.

A. Orena's Medical Condition

Orena spends much of his motion outlining his health, mostly citing the same medical conditions that he previously outlined in his 2021 motion for compassionate release. Compare Def. Mot. at 17, with ECF No. 1864 at 7 (sealed filing) (listing same conditions). Orena also cites three recent treatments at local hospitals in January and February 2025 (Def. Mot. at 21-22), as well as additional medical treatment at the FMC Devens Bureau of Prisons facility. While this medical care indicates the BOP is taking appropriate steps to address Orena's health issues, the government concedes – as it did in 2021 – that Orena meets the standard for "extraordinary and compelling" circumstance for these purposes. While the defendant's medical conditions meet the threshold "extraordinary and compelling reason" requirement for the Court to consider the defendant's request under § 1B1.13, consideration of the 18 U.S.C. § 3553(a) factors indicates that his release is not warranted here. See 18 U.S.C. § 3582(c)(1)(A).

B. Nature and Circumstances of the Offense

For most of his adult life, Orena associated with and identified as a member of the Colombo crime family, a group which has profited through crime and enforced its actions with violence. As Judge Weinstein noted, "These mobsters, working within their own and with other mobs, have thrived in and cultivated a complex and pervasive culture of crime that infests and sucks dry entire communities and industries within this city and surrounding areas." Sessa, 821 F. Supp. at 874. These criminal organizations, including the Colombo crime family, continue to affect New York City to this day. Orena ultimately rose through the ranks to become the family's de facto leader, and when his position, income and reputation were threatened, he plotted to kill a rival, precipitating a years-long immensely violent conflict. Indeed, this conflict claimed nearly a dozen lives, threatened even more and flooded city streets with firearms. Some of the victims were innocent bystanders whose deaths resulted from Orena's senseless power struggle, and others had chosen to affiliate with organized crime. Once his position of power was secured, Orena used his leadership position within the Colombo crime family not just to incite deadly violence among its members but also to order the deaths of specific individuals. Specifically, Orena ordered his subordinates to murder Ocera, who was subsequently strangled to death after which his body was not discovered for nearly two years. The defendant later ordered the murder of Leale, the man the defendant used to carry out Ocera's assassination, in part as punishment for the discovery of Ocera's decomposing corpse.

In his motion, Orena argues his life sentence was unwarranted and only awarded because he chose to go to trial and was convicted. Def. Mot. at 2-3 ("A life sentence is quickly given out in the event a defendant, in general choses to go to trial and is convicted. . . . This is exactly the situation we have with Orena."). However, Judge Weinstein wrote, Orena "must be imprisoned for life." See supra pp. 4-6. Accordingly, Judge Weinstein chose to sentence Orena not to one life sentence but to three life sentences. There was nothing impulsive about Judge Weinstein's lengthy and well-reasoned opinion setting forth the rationale for life imprisonment.

C. History and Characteristics

Orena's history and characteristics also support the denial of his motion. Orena's criminal history includes two convictions that stemmed from his association with the mafia (and further evidence his long-standing involvement in organized crime), in addition to many other

12

arrests, see PSR ¶ 274-89, and an attempt to obstruct justice following his arrest in the instant case, by trying to conceal his illegal purchase of a gun after his arrest in the instant case. As explained, the defendant was not simply a member of the Colombo crime family — he rose through its ranks and sought to take and keep power from his rivals. In his motion, Orena does not address his long-standing connection to organized crime or his crimes of conviction.

Remarkably, in his motion, Orena claims he has "always" accepted responsibility for his offenses. Def. Mot. at 4 ("Also, he has never made any excuses for his decidedly serious criminal conduct. Orena has never sought to justify, diminish or detract from the gravity of his offenses. Rather, he has always and unequivocally accepted responsibility for his criminal conduct that he had committed."); see also id. at 6 (noting Orena "has always accepted full responsibility for, and was remorseful for, the crimes he committed"). Such a statement could not be further from the truth. Since his conviction three decades ago, Orena has consistently sought to undermine his conviction, claiming everyone else was at fault from his co-conspirators, to the cooperating witnesses, to the investigating FBI agents, to the prosecutors assigned to the case. As recently as the February 2024 status conference – the most recent such conference before this Court – Orena has claimed his innocence. Before the Second Circuit, his counsel has repeatedly referred to the instant investigation as the "most corrupt prosecution" in recent history.

D. The Need for the Sentence Imposed

One of the most compelling reasons to deny the defendant's request for release is the need for the sentence imposed. In imposing life imprisonment, Judge Weinstein noted just punishment and deterrence weighed heavily in favor of the lengthy prison sentence. He wrote, "[c]onsiderations of incapacitation and general deterrence overwhelm all other factors in the sentencing of . . . Orena," who had been fully enmeshed in the "net of criminal activity" for his adult life. Sessa, 821 F. Supp. at 874. Judge Weinstein found Orena's severe sentence "may also by general deterrence save youngsters who might be seduced into the criminal lifestyle of these mobsters." Id.

Courts have relied on this factor in denying motions for a sentence reduction when granting the motion "would minimize the nature and seriousness of the offense." United States v. Logan, 2020 WL 730879 (W.D. Ky. Feb. 13, 2020) (denying motion of 81-year-old defendant who suffers from prostate cancer, glaucoma, blindness, diabetes, and other medical conditions, and has served more than 22 years of his life sentence); see also Walker v. United States, 2020 WL 2308468 (S.D. Fla. May 8, 2020) (denying motion of defendant with serious health issues because of the need to ensure adequate punishment, deterrence, and community protection); United States v. Stanley, 2020 WL 6060877 (M.D. La. Oct. 14, 2020) (denying motion of defendant unable to move without wheelchair operator because of the seriousness of his robbery offenses and the need for adequate deterrence). As the district court noted in Gotti, an early release in that case would have undermined the goals of sentencing as "the integrity of our justice system demands a sentence sufficient to punish the defendant for his crimes and to deter others who might consider following in his path." 433 F. Supp. 3d at 620 (quoting Casey, J. sentencing transcript 23:22–25). The same stands true in this case, for this defendant.

13

E.  Unwarranted Sentencing Disparities

Orena argues his compassionate release would address sentencing disparities with his co-defendants. Def. Mot. at 11. However, Section 3553(a)(6) speaks of "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6); see also United States v. Conatser, 514 F.3d 508, 521 (6th Cir. 2008) (citations omitted) (noting this factor "concerns national disparities between defendants with similar criminal histories convicted of similar criminal conduct"). Moreover, Orena was the acting boss of the crime family, and as such, was more culpable than the subordinates he directed to shoot and kill his rivals. Comparing Orena's life sentence to those sentences imposed on other defendants convicted in connection with their leadership of a major organized crime family indicates Orena's sentence is not aberrant. For instance, John Gotti, the Gambino crime family boss, was convicted in 1992 and sentenced to life imprisonment. No. 90-CR-1051-ILG (E.D.N.Y.). Carmine Persico, the long-time official boss of the Colombo crime family, was convicted in 1986 and sentenced to 139 years' imprisonment. No. 85-CR-139 (S.D.N.Y.). Anthony Corallo, the boss of the Lucchese crime family, was convicted in 1986 and sentenced to 100 years' imprisonment. No. 86-CR-139 (S.D.N.Y.). Anthony Salerno, the boss of the Genovese crime family, was convicted in 1987 and 1988 and sentenced to 100 and 70 years, respectively. No. 85-CR-139 (S.D.N.Y.) and 86-CR-245 (S.D.N.Y.).

Orena also cites United States v. Vanholten, No. 12-CR-96, 2023 WL 8357739, at *1 (M.D. Fla. Dec. 1, 2023) (reducing defendant's life sentence, on the government's consent, when defendant sold $20 of marijuana to undercovers officers at 19 years old), appearing to argue that Orena would not face his imposed sentence under the law if convicted today. Def. Mot. at 11. However, Orena would face a mandatory life sentence were he convicted today of the murder of Thomas Ocera in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(1).[5]

* * *

Orena claims he is "precisely the type of individual for whom the First Step Act was intended." Def. Mot. at 4. However, courts have routinely denied compassionate release for violent members of organized crime syndicates. See United v. Brunetti, No. 94-127-13, 2020 WL 4516541 (E.D. Pa. July 31, 2020) (denying release for a 73-year-old mafia member who had served 26 years of a 40-year sentence despite serious medical conditions); United States v. Urso, No. 03-CR-1382 (NGG), 2019 WL 5423431, at *3 (E.D.N.Y. Oct. 23, 2019) (denying release for a defendant who was involved in organized crime for over thirty years as an employee and high-ranking member of the Bonnano crime family and had engaged in extortion, illegal gambling and murder); United States v. Gotti, 433 F. Supp. 3d 613, 619-20 (S.D.N.Y. 2020) (denying motion to reduce sentence of former leader of the Gambino crime family despite his serious, debilitating, and progressive medical conditions due to the violent nature of his offenses). Courts have also denied release for defendants convicted of murder. See, e.g., United States v. Arana, 2020 WL 2214232 (E.D. Mich. May 7, 2020) (denying motion to reduce life sentence despite defendant's

---

[5]  Section 1959 was amended on September 13, 1994, and now makes the punishment for murder death or mandatory life imprisonment. See Guzman v. United States, 277 F. Supp. 2d 255, 261 (S.D.N.Y. 2003), aff'd, 112 F. App'x 766 (2d Cir. 2004).

14

acute pancreatitis, which left him wheelchair-bound, and other conditions, due to the nature of his offenses, which included murder-for-hire); United States v. Epstein, 2020 WL 2537648 (D.N.J. May 19, 2020) (denying motion for 74-year-old defendant in poor health because his conduct involved years-long conspiracy that included multiple violent kidnappings); United States v. Martin, 2020 WL 3960433 (E.D. Pa. July 13, 2020) (denying motion for 66-year-old defendant with chronic obstructive pulmonary disease, asthma and heart disease who had been convicted of felony murder and two bank robberies serving a three-strikes life sentence, due to his violent history). Here, Orena's criminal conduct involved "the ultimate violence, the taking of a human life." Arana, 2020 WL 2214232, at *6. Life in prison is still a proportionate and just punishment.

V. Conclusion

  For the reasons set forth above, the defendant's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) should be denied.

            Respectfully submitted,

            JOHN J. DURHAM
            United States Attorney

     By:  /s/
        Devon Lash
        Assistant U.S. Attorney
        (718) 254-7000

cc: Gerard Marrone, Esq. (counsel to the defendant) (by ECF)